UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OMAN ALUMINIUM ROLLING COMPANY SPC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Court No. 25-00215<br><br>**Non-Confidential Version**<br>Business Proprietary Information has been removed from pages 4 and 8. |

# COMPLAINT

1. Plaintiff Oman Aluminium Rolling Company SPC ("Plaintiff" or "OARC"), by and through its attorneys, alleges and states as follows:

2. Plaintiff seeks judicial review of the final results of the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping duty order on certain aluminum foil from the Sultanate of Oman, covering the period November 1, 2022 through October 31, 2023 (the "period of review" or "POR"). *Certain Aluminum Foil From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 44,162 (Sept. 12, 2025) ("*Final Results*"), and accompanying Issues & Decision Memorandum ("IDM").

## JURISDICTION

3. Plaintiff brings this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii) to review a final determination made by Commerce under 19 U.S.C. § 1675. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

NON-CONFIDENTIAL VERSION

## STANDING

4. Plaintiff is a producer and exporter of aluminum foil from Oman and, thus, meets the definition of an "interested party" within 19 U.S.C. § 1677(9)(A).

5. Plaintiff participated in the underlying administrative review giving rise to this action and, therefore, constitutes "a party to the proceeding in connection with which the matter {arose}" under 19 U.S.C. § 1516a(a)(2)(A).

6. As an interested party that participated as a party in the underlying proceeding, Plaintiff has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF THE ACTION

7. Commerce published notice of its final results in the *Federal Register* on September 12, 2025. 90 Fed. Reg. 44,162 (Sept. 12, 2025).

8. Plaintiff filed its Summons for this action on September 26, 2025.

9. Plaintiff timely filed this Complaint within 30 days of the filing of the Summons in this action, as required by the time limits set forth in 19 U.S.C. § 1516a(a)(2)(A) and Court Rule 3(a)(2). Therefore, Plaintiff commenced this action within the time period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and 28 U.S.C. § 2636(c).

## PROCEDURAL HISTORY

10. On November 12, 2021, Commerce published in the *Federal Register* the antidumping duty order on aluminum foil from Oman (*see Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 62,790 (Nov. 12, 2021) ("Order")).

11. On November 2, 2023, Commerce published in the *Federal Register* a notice of opportunity to request an administrative review of the Order for the POR, covering the period November 1, 2022 through October 31, 2023 (*see Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 75,270, 75,271 (Nov. 2, 2023)).

12. On November 30, 2023, the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas, Inc., JW Aluminum Company, and Novelis Corporation (collectively, "Petitioners"), requested an administrative review of the shipments of subject merchandise produced and exported by OARC during the POR.

13. On December 29, 2023, Commerce initiated an administrative review of the Order (*see Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 90,168 (Dec. 29, 2023)).

14. As the sole mandatory respondent, OARC submitted its response to Section A of Commerce's initial questionnaire on April 26, 2024. Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Certain Aluminum Foil from Oman: Response to Section A of the Department's Initial Questionnaire* (Apr. 26, 2024). The Section A Response included, as Exhibit A-8, sales trace documents for a sample U.S. sale, in response to Commerce's standard question. On May 15, 2024, OARC submitted its response to Section C of Commerce's initial questionnaire. Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Certain Aluminum Foil from Oman: Response to Sections C-D of the Department's Initial Questionnaire* (May 15, 2024). In this response, OARC explained that it maintains freight expense data in its SAP system in "stages," with Stage 1 representing movement expenses incurred in Oman, Stage 2 representing Omani port and shipping line movement expenses, and Stage 3 including movement

expenses incurred in the United States. *Id.* at C-21. OARC explained that it reported its freight expenses in stages in the applicable freight fields. *See id.* OARC reported these expenses on a per-unit basis, either in Omani Rial ("OMR") per metric ton or U.S. dollars per metric ton. *See id.* at C-23, C-25, C-27.

15.   On June 10, 2024, Petitioners filed comments on OARC's Section C Response. Letter from Kelley Drye & Warren LLP to Sec'y of Commerce, *Administrative Review of Certain Aluminum Foil from Oman – Petitioners' Deficiency Comments on the Sections C and D Questionnaire Response of Oman Aluminium Rolling Company LLC* (June 10, 2024). Petitioners raised, inter alia, concerns with OARC's reporting of its movement expenses, including the methodology that OARC used to calculate transaction-specific movement expenses. *See id.* at 11-13. Petitioners again objected to OARC's movement expense reporting in pre-preliminary results comments filed on November 12, 2024. *See* Letter from Kelley Drye & Warren LLP to Sec'y of Commerce, *Administrative Review of Certain Aluminum Foil from Oman – Petitioners' Pre-Preliminary Comments Regarding the Oman Aluminium Rolling Company LLC* (Nov. 12, 2024) ("Petitioners' Pre-Preliminary Comments") at 29-34. OARC responded to Petitioners' Pre-Preliminary Comments, addressing each of these allegations, on November 21, 2024. *See generally* Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Certain Aluminum Foil from Oman: Response to Petitioners' Pre-Preliminary Comments* (Nov. 21, 2024) ("OARC's Pre-Preliminary Rebuttal Comments"). In its Pre-Preliminary Rebuttal Comments, OARC had explained that, "{w}ith the exception of [          ] missing freight data in SAP, OARC reported freight on an actual delivery basis, so OARC had no freight allocation calculation to explain to the Department," and reiterated that for [          ] with the missing freight data in SAP, it reported POR average freight expenses. *See id.* at 22-23. OARC

4

also identified where in its Section C questionnaire response it reported movement expenses. *See id.* at 23. Despite having received Petitioners' comments and OARC's responses, prior to the *Preliminary Results*, Commerce never requested any additional information or clarification from OARC regarding its reporting of movement expenses in its Section C Response.

16. On December 6, 2024, Commerce preliminarily determined an estimated weighted-average dumping margin of 5.84 percent for OARC. *Certain Aluminum Foil From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 100,976 (Dec. 13, 2024) ("*Preliminary Results*"), and accompanying Issues and Decision Memorandum ("PDM").

17. In the *Preliminary Results*, Commerce calculated export price for OARC "based on packed prices to unaffiliated purchasers in the United States." PDM at 7. Commerce explained that, "in accordance with our practice, we made additions, as appropriate, for freight recoveries, marine insurance recoveries, and packing recoveries capped at the amount of the applicable expense incurred on each sale. We made deductions, where appropriate, for billing adjustments, (*e.g.*, wrong billing, price difference, short payment, *etc.*), movement expenses (*i.e.*, inland freight to the port of exportation, domestic brokerage and handling in the country of manufacture, international freight, and marine insurance), in accordance with section 772(c)(2)(A) of the Act." *Id*. When it issued the *Preliminary Results*, Commerce did not find that OARC had failed to supply any of the information that Commerce required for the calculation of the preliminary dumping margin or indicate that there were open issues that required resolution through the solicitation of additional information from OARC. *See id.*

18. In its *Preliminary Results*, Commerce also established a briefing schedule, instructing submission of case briefs "no later than 30 days after the date of publication of this notice," or by January 13, 2025. *Preliminary Results*, 89 Fed. Reg. at 100,976.

19. On December 9, 2024, Commerce posted a memorandum to the record notifying parties that Commerce was tolling the statutory and regulatory deadline in this proceeding by 90 days. Memorandum from Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, to The Record, *Tolling of Deadlines for Antidumping and Countervailing Duty Proceedings* (Dec. 9, 2024).

20. On January 7, 2025, almost a month after Commerce had established the briefing schedule and only days before the deadline for case briefs, Petitioners requested that Commerce extend the briefing schedule and issue a supplemental questionnaire to OARC. Letter from Kelley Drye & Warren LLP to Sec'y of Commerce, *Administrative Review of Certain Aluminum Foil from Oman – Request for Extension of Briefing Schedule and Supplemental Questionnaire* (Jan. 7, 2025). In their letter, Petitioners again alleged that OARC did not demonstrate the accuracy of its movement expenses. *See id.* at 3-9. Petitioners claimed that the sales documentation submitted by OARC in its Section A Response showed that OARC allocated certain freight expenses but did not explain the allocation, contrary to OARC's claim that it reported per-unit freight expenses. *See id.* at 3-4. Petitioners also claimed, based on a field in OARC's invoice to its customer listing a separate amount for "freight and insurance," that OARC had obtained unreported freight revenue. *See id.* at 7, 9. Petitioners thus urged Commerce to extend the briefing schedule and issue a supplemental questionnaire to OARC to resolve these supposed shortcomings in OARC's reporting. *See id.* at 2.

21. On January 10, 2025, just three days after Petitioners filed their letter and one business day before the deadline for case briefs, Commerce suspended the briefing schedule "to evaluate the record and comments submitted to determine whether to issue a further supplemental questionnaire." Memorandum from Alex Cipolla, Senior International Trade Compliance Analyst, to The File, *Administrative Review of the Antidumping Duty Order on Certain Aluminum Foil from the Sultanate of Oman: Suspension of Briefing Schedule* (Jan. 10, 2025). On the same day, OARC submitted a letter on the record objecting to Commerce's last-minute suspension of the briefing schedule. *See* Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Certain Aluminum Foil from Oman: Response to Petitioners' Request for Extension of Briefing Schedule and Supplemental Questionnaire and the Department's Suspension of Briefing Schedule* (Jan. 10, 2025). In that letter, OARC pointed out that Petitioners' arguments were simply a rehash of arguments that Petitioners had already raised in their November 12, 2024 Pre-Preliminary Comments, to which OARC had responded in its November 21, 2024, Pre-Preliminary Rebuttal Comments. *See id.* at 4.

22. In its January 10, 2025 letter, OARC argued that, contrary to Petitioners' claim that OARC's commercial invoice included freight information that did not match OARC's freight reporting for the sale represented in its Section A Response sales trace exhibit, the sales documents provided in OARC's Section A Response reveal that the single shipment and associated freight expenses cover two distinct sales transactions and corresponding invoices, which tie to OARC's reported freight expenses and the freight invoices included in the same sales trace exhibit in its Section A Response. *See id.* at 4-5.

23. To support the points raised in its January 10, 2025 letter, OARC included a worksheet ("Attachment 1"), comprising purely information already on the record, explaining how

7

the per-unit freight reported by OARC for the two sales ties to the freight invoices included in the sales trace documents. *See id.* at 4-5, Attachment 1. OARC also pointed out that, contrary to Petitioners' baseless assertion that the commercial invoice indicates that OARC had "**[**

**]**," the freight information indicated in the commercial invoice clearly shows that it is for CBP customs valuation purposes and does not represent a separate charge to the customer. *See id.* at 5-6.

24. Petitioners incorrectly alleged that the explanations provided by OARC in its January 10, 2025 letter constituted untimely new factual information, despite the submission containing only information that already existed on the record at that time. On April 23, 2025, Commerce accepted the information on the record pursuant to 19 C.F.R. § 351.301(a), stating that:

> {A}t the time of OARC's January 10, 2025, letter, Commerce was considering requesting information relating to the allocation of OARC's freight expenses. Based on our intent to inquire further regarding movement expenses, allocations, and revenue and OARC's submission of limited information to this effect, but considering the unsolicited and untimely nature of OARC's submission, we hereby find good cause to extend the time limit for submission of information contained in OARC's rebuttal and allow it to remain on the record pursuant to 19 CFR 351.301(a).

25. Commerce issued the *Final Results* on September 8, 2025. *See 90* Fed. Reg. 44,162. In the *Final Results*, Commerce found that for the reporting of domestic inland freight expenses (DINFLTPU), international freight expenses (INTNFR1U/INTFR2U), U.S. inland freight expenses (INLFWCU), and U.S. customs duty expenses (USDUTYU), OARC failed to identify that such expenses reflected allocations, not transaction-specific unit costs. *See* IDM at 4-5. Commerce also found that OARC's January 10, 2025 submission supposedly "revealed that freight revenues were included in the gross unit price for certain sales, but not separately broken out as a variable in the sales database." IDM at 6.

26. Commerce claimed that OARC (1) had not provided detailed allocation information supporting its movement expenses and (2) failed to provide any information on its collection of

8

freight revenues related to specific freight expenses, which also did not permit Commerce to "cap" freight revenue pursuant to its normal practice. *See* IDM at 6-8.

27. As a result of these alleged deficiencies, Commerce applied partial adverse facts available ("AFA") to OARC. *See id.* at 8, 11. For the alleged failure to provide allocation information supporting its movement expenses, Commerce disregarded OARC's reported per-unit expenses and instead identified OARC's highest reported transaction-specific expense for any reported transaction, and applied that amount as the relevant movement expense incurred for all reported transactions. *See id.* at 8. For the alleged failure to report freight revenue for certain freight expenses, Commerce reduced gross unit price for all sales by the percentage difference between the net price (exclusive of freight revenue) and gross unit price (inclusive of freight revenue) for the single sample sale information contained on the record in the sample sales trace provided in Exhibit A-8 of OARC's Section A Response and Attachment 1 included in OARC's January 10, 2025 submission. *See id.* at 7-8.

28. As a result of its findings, Commerce assigned OARC a final weighted-average dumping margin of 42.48 percent. *See Final Results*, 90 Fed. Reg. at 44,162. This final dumping margin represents a more-than-seven-fold increase in OARC's preliminary margin, based on the same record that Commerce used to calculate OARC's preliminary margin.

## STATEMENT OF CLAIMS

29. Paragraphs 1 through 28 are incorporated by reference.

30. In the following respects and for other reasons apparent from the record of the administrative proceeding, Commerce's *Final Results* are not supported by substantial evidence and otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

9

## COUNT ONE

31. Paragraphs 1 through 30 are incorporated by reference.

32. In the *Final Results*, Commerce found that OARC failed to notify Commerce that it had allocated its freight expenses, as instructed in Commerce's initial questionnaire. In doing so, Commerce conflates its instructions to explain the "method of allocation" in certain instances with its instructions to "describe how you calculated the unit cost." The general instructions of Commerce's initial questionnaire explain that respondents should "report price adjustments and expenses *only when* price adjustments and expenses *cannot be tied to a specific sale*." Letter from Brendan Quinn, Program Manager, to Oman Aluminium Rolling Company, *Administrative Review of the Antidumping Duty Order on Aluminum Foil from Oman: Request for Information* (Mar. 25, 2024) ("Initial Questionnaire") at G-10 (emphases added). In its Section C questionnaire, Commerce instructs the respondent to report DINLFTPU based on an allocation, and to provide the "method of allocation," where necessary to do so "when more than one type or size of merchandise was shipped"—i.e., where it is necessary to attribute a portion of the total amount to the merchandise subject to reporting. *Id.* at C-18 to C-19. The instructions separately direct respondents, "{i}f it is not possible to specifically identify the cost of each shipment," to "describe how you derived the freight cost per unit." *Id.* at C-19. Commerce's instructions regarding fields INTNFRU, INLFWCU, and USDUTYU do not include instructions to explain a "method of allocation," but rather, require the respondent to "{d}escribe how you calculated the unit cost," as also required for field DINLFTPU. *See id.* at C-20 to C-22.

33. Commerce erroneously conflated these two separate requirements when it found that OARC's January 10, 2025 letter indicated that "OARC's reporting used an allocation and averaging of per unit freight costs that was not previously explained." IDM at 6. OARC did not

allocate freight expenses but rather reported, as instructed, actual freight expenses on a per-unit basis. As Commerce acknowledged, OARC explained that its expenses were not allocated because it reported actual per-unit freight expenses for each sale of subject merchandise, as instructed in the Section C questionnaire. *See id.* at 5, 11. Commerce's own questionnaire explains that expenses are only "allocated" when they "cannot be tied to a specific sale," Initial Questionnaire at G-10, which did not apply to OARC's movement expenses, as OARC's freight invoices expressly identified the sales to which they applied. The example provided in Attachment 1 of OARC's January 10, 2025 letter did not "reveal" that OARC allocated expenses, as OARC reported actual freight expenses that were attributable to individual sales of subject merchandise, as indicated by the invoice numbers identified on the freight documentation provided in OARC's Section A Response. Attachment 1 simply illustrated how OARC determined *per-unit costs*, which OARC described in its Section C questionnaire response—as instructed—were reported on an OMR/MT or USD/MT basis.

34.     Therefore, Commerce's finding that OARC misreported its freight expenses because it did not explain that it allocated certain freight expenses is not supported by substantial evidence on the record and is not otherwise in accordance with law.

## COUNT TWO

35.     Paragraphs 1 through 34 are incorporated by reference.

36.     In its *Final Results*, Commerce found that, because OARC had allocated certain freight expenses (and failed to explain that it did so), an unknown number of sales were not properly reported with separate freight revenue. IDM at 11. In making this determination, Commerce ignored its own longstanding practice, which Commerce itself described in its *Final Results*, of finding freight revenue when "the record contains evidence that the service was

negotiated between seller and buyer, and that the revenues do not exceed the expenses." IDM at 12. Evidence on the record does not indicate that OARC separately negotiated freight services with its customers. Further, even if OARC had allocated expenses and explained its method of allocation, there is no indication that a description of an allocation methodology would have revealed the existence of such negotiations. In short, Commerce did not have a basis to find that OARC's use (or non-use) of an allocation methodology had any bearing on whether OARC separately negotiated freight services with its customers.

37. OARC's January 10, 2025 letter, which Commerce found "revealed that freight revenues were included in the gross unit price for certain sales," provided no information or argumentation from which Commerce could reasonably infer that OARC separately negotiated freight services with its customers. Commerce did not explain how OARC's January 10, 2025 submission revealed the existence of freight revenue, as Commerce did not identify any particular statement or section of OARC's submission, let alone any other document submitted by OARC to Commerce, that suggests that OARC separately negotiated freight with its customers. In fact, the January 10, 2025 submission solely relied on freight expense documentation submitted in OARC's April 26, 2025 Section A Response (Exhibit A-8), which had been on the record for nearly eight months. OARC's January 10, 2025 submission simply provided an attachment that showed the addition, multiplication, and division to demonstrate the relationship between Exhibit A-8 and the per-unit amounts reported in the U.S. sales database, which responded to Petitioners' assertions in their January 7, 2025 submission disputing the accuracy of OARC's freight reporting.

38. To the extent that Commerce's finding is based on the existence of a freight and insurance-related field in OARC's commercial invoice, there is no evidence on the record that this field reflects negotiations with OARC's customers. To the contrary, the commercial invoice on its

12

face clearly indicates that the freight and insurance amounts noted in the invoice are "details for import duty calculation," and are thus provided for U.S. regulatory compliance purposes, and do not reflect a separate charge to the customer.

39. Accordingly, Commerce's finding that OARC had unreported freight revenue was not supported by substantial evidence on the record and was otherwise not in accordance with law.

## COUNT THREE

40. Paragraphs 1 through 39 are incorporated by reference.

41. Commerce improperly applied AFA in calculating OARC's export price because the circumstances did not meet the legal requirements under 19 U.S.C. § 1677e(b). Commerce asserted that it properly applied AFA because it did not have on the record detailed allocation information supporting OARC's movement expenses, and because OARC had failed to provide any information on its collection of freight revenues related to specific freight expenses. *See* IDM at 6. Commerce found that, as a result, OARC withheld information, failed to provide the information by the deadlines established, and significantly impeded the proceeding. *See id.*

42. The statute only permits Commerce to apply AFA when Commerce determines that an interested party has not acted to the best of its ability to comply with Commerce's information requests. *See* 19 U.S.C. § 1677e(b). Moreover, the statute requires Commerce to afford parties an opportunity to remedy deficiencies in its reported information, and only if the party fails to remedy the deficiency within the applicable time may Commerce disregard all or part of a party's responses. *See* 19 U.S.C. § 1677m(d) and (e).

43. First, Commerce did not have a basis to rely on facts available (with or without an adverse inference) because there were no gaps in the record. Commerce's finding that it did not have the information that it needed to confirm the accuracy of OARC's movement expenses rests

on the assumption that OARC had allocated costs but failed to disclose that it had done so, and that OARC had collected freight revenue based on freight services that it had purportedly negotiated with its customers. However, Commerce's assumptions are based on mischaracterizations of when costs are "allocated" as instructed in Commerce's initial questionnaire and are not supported by any record evidence. Moreover, in addition to erroneously characterizing OARC's calculation of per-unit freight costs as an "allocation," Commerce identified a supposed gap in the record in OARC's reporting of freight revenue despite the absence of record evidence of freight cost negotiations with OARC's customers that would suggest the existence of such revenue. Commerce further found that "OARC withheld such information," but Commerce could not have reasonably found that OARC withheld documentation when Commerce had no record evidence of its existence. When these erroneous assumptions are rectified, the record is complete, as demonstrated by Commerce's ability to calculate a preliminary margin for OARC without the need to gap-fill through the use of facts available.

44.   Second, Commerce applied AFA to OARC's reporting on two separate counts—*i.e.*, failure to provide explanation of OARC's alleged allocation methodology and failure to separately report freight revenue. However, Commerce provided a single reason for applying AFA on both counts—that "OARC's reporting *used an allocation and averaging of per unit freight costs* {(1)} that was not previously explained and {(2)} which revealed that freight revenues were included in the gross unit price for certain sales, but not separately broken out as a variable in the sales database." IDM at 6. Thus, Commerce found that OARC's allocation and averaging revealed the existence of freight revenue. Leaving aside whether OARC applied an allocation methodology, Commerce has not provided sufficient explanation as to how the use of an allocation methodology would reveal a gap in the record as to the existence of freight revenue. Thus, the Court should

14

hold that Commerce has not identified a basis upon which it can conclude that freight revenue information is missing from the record. Further, if the Court holds that OARC did not use an allocation methodology, it should also hold that Commerce did not have a basis to find that OARC collected freight revenue, as Commerce's conclusion on the latter is premised on the former.

45. Third, circumstances that might warrant the application of AFA were absent here. OARC cooperated to the best of its ability. OARC fully complied with Commerce's requests for information, and its responses did not meet the statutory threshold for applying AFA. To the extent that Commerce did not have the necessary information to complete its analysis, it was statutorily required to ask OARC for this remedy any apparent deficiencies, but it never did so. Although Commerce claimed that it did not have the opportunity to do so because it was not aware of any alleged deficiencies in OARC's reporting until its January 10, 2025 letter, Petitioners had raised questions regarding OARC's alleged allocation of movement expenses in comments filed six months before issuance of the *Preliminary Results*, in addition to raising them again in pre-preliminary results comments and again only a handful of days before the initial deadline for case briefs. Each time, OARC fully responded to these allegations. However, Commerce did not issue any supplemental questionnaires to OARC regarding its movement expenses in advance of the *Preliminary Results* and accepted OARC's reporting for purposes of the *Preliminary Results*, nor did Commerce indicate at the time that it issued the *Preliminary Results* that it required additional information from OARC to resolve any outstanding issues. Moreover, in accepting OARC's January 10, 2025 letter, Commerce indicated that it was considering issuing a supplemental questionnaire to OARC on the same day as OARC's submission, yet it again declined to do so.

46. Fourth, even if the Court determines that Commerce had a basis to find that there were gaps in the record, the Court should nevertheless conclude that OARC has acted to the best

of its ability, and should have applied at most neutral facts available. Upholding Commerce's determination that there were gaps in the record as substantiated by record evidence and otherwise in accordance with law does not preclude a finding that OARC acted to the best of its ability in interpreting Commerce's questions in a manner consistent with its reporting. OARC considered that it was interpreting Commerce's questions when it explained that it did not allocate costs, but reported actual costs on a per-unit basis. OARC explained its reasoning in response to Petitioners' allegations in their pre-preliminary results comments, and as Commerce accepted OARC's reporting in its *Preliminary Results*, there was no reason for OARC to consider otherwise, especially as its reporting was consistent with its reporting in the investigation. OARC's January 10, 2025 letter simply confirmed what it had already stated in its pre-preliminary results comments, and it provided no basis for Commerce to find that OARC had not cooperated to the best of its ability in reporting its per-unit movement expenses.

47.     Accordingly, Commerce's application of AFA to OARC was not supported by substantial evidence on the record and was otherwise not in accordance with law.

## COUNT FOUR

48.     Paragraphs 1 through 47 are incorporated by reference.

49.     Commerce also applied its AFA methodology in a manner inconsistent with its findings in the *Final Results*. First, Commerce over-applied certain international freight expenses reported in USD/MT, in the field INTNFR2U. Commerce acknowledged when applying partial AFA to the fields INLFWCU and USDUTYU that not all of OARC's sales incurred all of the logistics-related charges reported in the various U.S. sales database fields, and it only applied the AFA value where those expenses were incurred and previously reported, *i.e.*, where they were not equal to zero on the original sales record. Similarly, not all of OARC's sales incurred international

16

freight expenses in INTNFR2U, yet Commerce applied the AFA value in this field to *all* sales, even those that did not occur such expenses. Commerce's methodology was inconsistent with its partial AFA methodology in other fields and was not supported by substantial evidence or otherwise in accordance with law.

50. Commerce also did not account for billing adjustments (BILLADJU) when adjusting gross unit price (GRSUPRU) as part of its AFA methodology. In applying partial AFA to OARC's movement expenses, Commerce adjusted OARC's reported gross unit price. However, Commerce failed to account for OARC's submitted billing adjustments that were directly associated with adjustments to those gross unit prices. Given that Commerce's stated purpose was to remedy a supposed deficiency in OARC's gross unit price, Commerce should have also accounted for the reported billing adjustments associated with those gross unit prices.

51. Commerce further erred when it applied the highest-value partial AFA adjustment to OARC's reported USDUTYU field. As OARC explained in its Section C Response (at page C-28), OARC's methodology for reporting its USDUTYU expenses was separate and distinct from its reporting of freight expenses, and it reported duty expenses based on U.S. Customs and Border Protection data, not the values stored in OARC's accounting system. Commerce thus had no basis to find any deficiencies in OARC's USDUTYU reporting notwithstanding its findings with regard to OARC's freight expenses and should not have applied an AFA adjustment to these expenses.

52. Finally, Commerce failed to cap any supposed freight revenues by the amount of associated freight expenses, consistent with its normal practice. As part of its AFA adjustment in the *Final Results*, Commerce reduced the gross unit price for the amount of purported freight revenue, but it did not offset the freight expenses by that freight amount and instead deducted the full freight expense. This approach double-counted the freight expenses reported by OARC

because Commerce both reduced gross unit price for supposed freight revenue and deducted the full amount of OARC's reported freight expenses. This methodology was illogical, not supported by substantial evidence, and inconsistent with Commerce's practice.

53. Accordingly, Commerce's application of its AFA methodology in calculating OARC's antidumping margin in the *Final Results* was not supported by substantial evidence on the record and was otherwise not in accordance with law.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court (1) hold that Commerce's *Final Results* in the subject administrative review is unsupported by substantial evidence on the record and otherwise not in accordance with law; (2) remand the *Final Results* to Commerce for disposition consistent with any orders and opinions of this Court; and (3) provide such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ Bernd G. Janzen
Bernd G. Janzen
Yujin K. McNamara
Devin S. Sikes
Sydney L. Stringer
Sarah P. Tinaphong
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006

Dated: October 24, 2025

*Counsel to Plaintiff Oman Aluminium Rolling Company SPC*

## CERTIFICATE OF SERVICE

I, Bernd G. Janzen, hereby certify that copies of the foregoing Complaint were served on the following parties by certified mail, return receipt requested:

Attorney-in-Charge
**U.S. DEPARTMENT OF JUSTICE**
International Trade Field Office
National Courts Branch
26 Federal Plaza
New York, NY 10278

Supervising Attorney
**U.S. DEPARTMENT OF JUSTICE**
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

General Counsel
**U.S. DEPARTMENT OF COMMERCE**
Mail Stop 5875 HCHB
14th Street & Constitution Ave., NW
Washington, DC 20230

Chief Counsel
**U.S. DEPARTMENT OF COMMERCE**
Office of the Chief Counsel for Trade Enforcement and Compliance
International Trade Administration
1401 Constitution Ave., NW
Washington, DC 20230

John M. Hermann, Esq.
**KELLEY DRYE & WARREN LLP**
3050 K Street NW
Washington, DC 20007-5108

/s/ Bernd G. Janzen
Bernd G. Janzen