## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| OMAN ALUMINIUM ROLLING COMPANY SPC, | : <br> : <br> : |
| Plaintiff, | : <br> : |
| and | : <br> : |
| DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, INC. | : <br> : <br> : |
| Plaintiff-Intervenor, | : <br> : |
| v. | :     Court No. 25-00215 <br> : |
| UNITED STATES, | :     **Non-Confidential Version** <br> :     Business Proprietary |
| Defendant, | :     Information of OARC has <br> :     been removed from pages 5-6, |
| and | :     9-10, 19-22, and 38. <br> : |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP et al., | : <br> : <br> : <br> : |
| Defendant-Intervenors. | : <br> : |

## PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the U.S. Court of International Trade, Plaintiff Oman Aluminium Rolling Company SPC hereby moves for judgment on the agency record with regard to the final results of the U.S. Department of Commerce in the administrative review of the antidumping duty order on certain aluminum foil from the Sultanate of Oman, covering the period November 1, 2022 through October 31, 2023.  *Certain Aluminum Foil From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 44,162 (Sept. 12, 2025), and the accompanying Issues & Decision Memorandum.  For the reasons explained in the

accompanying memorandum, Plaintiff respectfully moves the Court to hold that Commerce's determination is neither supported by substantial evidence nor in accordance with law.  Plaintiff further moves the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Bernd G. Janzen

Bernd G. Janzen
Yujin K. McNamara
Devin S. Sikes
Sydney L. Stringer
Sarah P. Tinaphong
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006
bjanzen@akingump.com

*Counsel for Plaintiff Oman Aluminium Rolling Company SPC*

Dated:  April 8, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| OMAN ALUMINIUM ROLLING COMPANY SPC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| and | : | |
| | : | |
| DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, INC. | : | |
| | : | |
| Plaintiff-Intervenor, | : | |
| | : | |
| v. | : | Court No. 25-00215 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP et al., | : | |
| | : | |
| Defendant-Intervenors. | : | |

**<u>PROPOSED ORDER</u>**

Upon consideration of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, as well as all other papers filed in this proceeding, it is hereby

**ORDERED** that Plaintiff's Motion is **GRANTED**;

**ORDERED** that the U.S. Department of Commerce's final results in *Certain Aluminum Foil From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 44,162 (Sept. 12, 2025) ("*Final Results*"), and the accompanying Issues

& Decision Memorandum ("IDM"), are neither supported by substantial evidence on the record nor in accordance with law; and

**ORDERED** that Commerce shall issue a revised determination on remand that is supported by substantial evidence, in accordance with law, and otherwise consistent with all aspects of the Court's order and opinion in this matter.

Dated: _____          _____
             New York, NY                        Judge Jennifer Choe-Groves

2

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| OMAN ALUMINIUM ROLLING COMPANY SPC, | : <br> : <br> : |
| Plaintiff, | : <br> : |
| and | : <br> : |
| DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, INC. | : <br> : <br> : |
| Plaintiff-Intervenor, | : <br> : |
| v. | :     Court No. 25-00215 |
| UNITED STATES, | :     **Non-Confidential Version** |
| Defendant, | :     Business Proprietary <br> :     Information of OARC has <br> :     been removed from pages 5-6, |
| and | :     9-10, 19-22, and 38. |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP et al., | : <br> : <br> : |
| Defendant-Intervenors. | : <br> : |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2(c)(1) ...........................................................................1
    I.     Administrative Decision under Review ..................................................................1
    II.    Statement of the Issues ..........................................................................................2

STATEMENT OF FACTS ...........................................................................................................3

SUMMARY OF ARGUMENT ...................................................................................................11

ARGUMENT ..............................................................................................................................14
    I.     Subject Matter Jurisdiction and Standard of Review ..........................................14
    II.    The Final Results Are Not Supported by Substantial Evidence and
           Otherwise Not in Accordance with Law ..............................................................17
           A.    Commerce's Finding that OARC Misreported Its Freight Expenses
                 by Concealing Supposed "Allocation" of Those Expenses Is
                 Unsupported by Substantial Evidence and Constitutes an Abuse of
                 Discretion ................................................................................................17
                 1.    OARC Had No Freight Allocation Calculation
                         Methodology to Explain under the Terms of Commerce's
                         Questionnaire .................................................................................18
                 2.    OARC's January 10, 2025 Letter Did Not Reveal a Hidden
                         Allocation Methodology ................................................................21
                 3.    Commerce Abused Its Discretion by Depriving OARC of
                         Any Opportunity to Clarify Its Freight Reporting
                         Methodology ...................................................................................23
            B.    Commerce's Conclusion That OARC Concealed Supposed Freight
                   Revenue Is Unsupported by Substantial Evidence and Otherwise
                   Not in Accordance with Law ...................................................................24
            C.    Commerce's Application of Partial AFA in Its Calculation of
                   OARC's Export Price Is Unsupported by Substantial Evidence and
                   Otherwise Not in Accordance with Law ..................................................27
                 1.    Commerce Failed to Provide the Required Opportunity for
                         OARC to Cure the Claimed Defect in the Record ........................28
                 2.    Commerce Lacked Authority to Rely on Facts Available ..............30
                 3.    Commerce Lacked Authority to Apply Adverse Inferences .........33
            D.    Commerce's Application of AFA Is Unsupported by Substantial
                 Evidence and Otherwise Not in Accordance with Law .............................36
                 1.    Commerce Unlawfully Extended Its AFA Adjustment to
                       OARC's U.S. Duty Payments, with Which Commerce
                       Found No Fault ...............................................................................36
                 2.    Commerce Unreasonably Penalized OARC by Inflating Its
                       Freight Expenses ............................................................................37

CONCLUSION ..........................................................................................................................41

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

**CASES**

*ABB, Inc. v. United States*, 273 F. Supp. 3d 1200 (Ct. Int'l Trade 2017)..................................... 39

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327 (Ct. Int'l Trade 2011) ...................................................................................................... 15

*Altx, Inc. v. United States*, 167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ..................................... 16

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004)....................................................... 15, 16

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ................................................. 15

*Böwe-Passat v. United States*, 17 Ct. Int'l Trade 335 (1993) ......................................... 23, 24, 27

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012)..... 16

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ....................................................................... 15

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016)................................. 14, 16

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)............................................................. 17

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)............................................ 15

*Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020)........... 33, 34, 35

*Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018)........................ 29

*Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021).................. 28, 29

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017)................................ 16

*Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608 (Ct. Int'l Trade 1993) ................ 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................ 16, 39

*Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019)........................... 34

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ........................ 14, 33, 35, 36

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ................................................ 17

*NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007) .......................................... 29

*OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375 (Fed. Cir. 2019)............................................. 16

*PAM S.p.A. v. United States*, 32 Ct. Int'l Trade 779 (2008) ......................................................... 27

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)............................................. 17, 39

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005) ................................ 17, 24, 39

*Steel Auth. of India v. United States*, 149 F. Supp. 2d 921 (Ct. Int'l Trade 2001) ........................ 34

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) ................... 34

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2005) ............................... 16, 26, 32

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996)) ............................................. 17

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)................................................................ 15

*Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221 (Ct. Int'l Trade 2022).............. 16

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ..... 16

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011).................. 14

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................................................... 14

19 U.S.C. § 1677e ........................................................................................................................ 27

19 U.S.C. § 1677e(a)............................................................................................................. passim

19 U.S.C. § 1677e(b) ................................................................................................................... 37

19 U.S.C. § 1677e(b)(1)................................................................................................... 13, 27, 33

19 U.S.C. § 1677f(i)(3)(A) ........................................................................................................... 16

19 U.S.C. § 1677m(d) ........................................................................................................... passim

19 U.S.C. § 1862......................................................................................................................... 36

28 U.S.C. § 1581(c) ..................................................................................................................... 14

**REGULATIONS**

19 C.F.R. § 351.301(a)................................................................................................................... 9

**NON-CONFIDENTIAL VERSION**

## ADMINISTRATIVE DECISIONS

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 75,270 (Nov. 2, 2023) ................................................................................................................. 3

*Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey:  Antidumping Duty Orders*, 86 Fed. Reg. 62,790 (Nov. 12, 2021) ...................................................................................................... 3

*Certain Aluminum Foil From the Sultanate of Oman:  Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 44,162 (Sept. 12, 2025)............... passim

*Certain Aluminum Foil From the Sultanate of Oman:  Preliminary Results of Antidumping Duty Administrative Review:  2022-2023*, 89 Fed. Reg. 100,976 (Dec. 13, 2024) ............ passim

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 90,168 (Dec. 29, 2023) ............................................................................................................... 3

## OTHER AUTHORITIES

S.Rep. No. 752, *as reprinted in* S. Doc. No. 248 (1944-46) ........................................................ 15

NON-CONFIDENTIAL VERSION

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I.    Administrative Decision under Review

Plaintiff Oman Aluminium Rolling Company SPC ("OARC") challenges the U.S. Department of Commerce's ("Commerce") final results in the administrative review of the antidumping duty order on certain aluminum foil from the Sultanate of Oman, covering the period November 1, 2022 through October 31, 2023 ("POR"). *Certain Aluminum Foil From the Sultanate of Oman:  Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 44,162 (Sept. 12, 2025) ("*Final Results*"), P.R. 123, and accompanying Issues & Decision Memorandum ("IDM"), P.R. 117.[1]

As OARC details below, Commerce blindsided OARC in the *Final Results* with partial adverse facts available ("AFA") on the basis of an allegation made by Petitioners of supposed deficiencies in its freight expense reporting, but provided OARC with *no* indication prior to the *Final Results* of any shortcomings in its reporting and *no* opportunity to submit further information to clarify or rectify the supposed deficiency.  Commerce "T-boned" OARC at the very end of the administrative review with a more-than-seven-fold increase in its dumping margin, even though OARC complied with Commerce's reporting instructions.  Commerce's approach unlawfully deprived OARC of its right to attempt to cure any supposed defects in the record and constitutes an impermissible "gotcha" under the law.

The Court should not allow this abuse of process to stand.

---

[1] Commerce divided the record into two parts, public and confidential.  "P.R.__" refers to a document in the public record.  "C.R.__" refers to a document in the confidential record.  All document citations refer to the item number in the relevant index.  All page citations refer to the page in the item number cited.

1

NON-CONFIDENTIAL VERSION

## II.    Statement of the Issues

1.    Whether Commerce's finding that OARC had concealed a method for allocating its freight expenses, when OARC explained that it reported its actual, transaction-specific freight expenses on a per-unit basis, consistent with Commerce's reporting instructions, is supported by substantial evidence and otherwise in accordance with law.

2.    Whether Commerce's finding that OARC's letter of January 10, 2025 revealed a previously hidden freight expense allocation methodology, when that letter cited existing record evidence to rebut petitioners' longstanding allegation of misreported freight expenses that DOC did not investigate, is supported by substantial evidence and otherwise in accordance in law.

3.    Whether Commerce's refusal to seek further information about OARC's freight expense reporting, when Petitioners had repeatedly raised their allegation since the outset of the administrative review, constituted an abuse of discretion.

4.    Whether Commerce's finding that OARC's letter of January 10, 2025 also revealed unreported freight service revenue, when Commerce did not specify how it did so or provide OARC with an opportunity to provide clarifying information, is supported by substantial and otherwise in accordance with law.

5.    Whether Commerce's decision not to provide OARC with an opportunity to remedy alleged deficiencies in its freight expense reporting is supported by substantial evidence and otherwise in accordance with law.

6.    Whether Commerce's finding that the record contains gaps pertaining to OARC's freight expense reporting that justify resort to facts available is supported by substantial evidence and otherwise in accordance with law.

7.    Whether Commerce's justification for the application of adverse inferences to OARC is supported by substantial evidence and otherwise in accordance with law.

2

NON-CONFIDENTIAL VERSION

8.    Whether Commerce's determination to extend its AFA adjustment to OARC's U.S. duty payments, in addition to its U.S. freight expenses, is supported by substantial evidence and otherwise in accordance with law.

9.    Whether Commerce's double-counting of OARC's freight expenses in its AFA adjustment is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

On November 12, 2021, Commerce published in the *Federal Register* the antidumping duty order on aluminum foil from Oman. *Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 62,790 (Nov. 12, 2021) ("Order").

On November 2, 2023, Commerce published in the *Federal Register* a notice of opportunity to request an administrative review of the Order for the POR. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 75,270, 75,271 (Nov. 2, 2023). P.R. 1. On December 29, 2023, based on a request filed by the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges America, Inc., JW Aluminum Company, and Novelis Corporation ("Petitioners"), Commerce initiated an administrative review of the Order. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 90,168 (Dec. 29, 2023). P.R. 3.

On March 25, 2024, Commerce issued its initial questionnaire to OARC. *Administrative Review of the Antidumping Duty Order on Aluminum Foil from Oman: Request for Information* (Mar. 25, 2024) ("Initial Questionnaire"), P.R. 12. The general instructions for Commerce's Initial Questionnaire provide that respondents should "{r}eport price adjustments and expenses on an allocated basis . . . only when price adjustments and expenses cannot be tied to a specific sale,"

3

and include other reporting guidance for expenses not incurred on a transaction-specific basis, where allocation to individual sales may be needed.  *Id*. at G-10.

In Section C of its Initial Questionnaire, Commerce also instructs respondents to report expenses for the field DINLFTPU based on an allocation, and to provide the "method of allocation," where necessary to do so "when more than one type or size of merchandise was shipped."  *Id*. at C-18 to C-19.  The instructions further direct respondents, "{i}f it is not possible to specifically identify the cost of each shipment," to "describe how you derived the freight cost per unit."  *Id*. at C-19.  For the fields INTNFRU, INLFWCU, and USDUTYU, Commerce's instructions do not include mention of whether to explain any "method of allocation," but instead require respondents to "{d}escribe how you calculated the unit cost," as also required for the field DINLFTPU.  *See id*. at C-20 to C-22.

On April 26, 2024, OARC submitted its response to Section A of the Initial Questionnaire. *Response to Section A of the Department's Initial Questionnaire* (Apr. 26, 2024) ("Section A Response"), P.R. 19 to 27, C.R. 3 to 8.  The Section A Response included, as Exhibit A-8, sales trace documents, including a commercial invoice, for a sample U.S. sale.  *See id.* at Exhibit A-8, P.R. 20, C.R. 4.

On May 15, 2024, OARC submitted its response to Section C of the Initial Questionnaire. *Certain Aluminum Foil from Oman:  Response to Sections C-D of the Department's Initial Questionnaire* (May 15, 2024) ("Section C Response"), P.R. 32 to 38, C.R. 37 to 47.  In this response, OARC explained that it maintains freight expense data in its SAP system in "stages," with Stage 1 representing movement expenses incurred in Oman, Stage 2 representing Omani port and shipping line movement expenses, and Stage 3 including movement expenses incurred in the United States.  *Id*. at C-21, P.R. 32, C.R. 37.  OARC further explained that it reported its freight

4

expenses in stages in the applicable freight fields.  *See id*.  OARC reported these expenses on a per-unit basis, either in Omani Rial ("OMR") per metric ton or U.S. dollars per metric ton.  *See id*. at C-23 (for DINLFTPU), C-25 (INTNFRU), and C-27 (INLFWCU).  Additionally, for each of these fields, OARC explained that one U.S. sales transaction, SEQU [   ], was a sample sale with no associated freight data in OARC's SAP system, such that OARC calculated and reported POR average expenses.  *See id*.

On June 10, 2024, Petitioners filed comments on OARC's Section C Response. *Administrative Review of Certain Aluminum Foil from Oman – Petitioners' Deficiency Comments on the Sections C and D Questionnaire Response of Oman Aluminium Rolling Company LLC* (June 10, 2024) ("Pet. June 10, 2024 Letter"), P.R. 42, C.R. 51.  Petitioners addressed, *inter alia*, OARC's reporting of its movement expenses, questioning the methodology that OARC had used to calculate transaction-specific movement expenses and alleging that OARC had failed to separately report any freight service revenue.  *See id*. at 11-13.  Petitioners reiterated their comments concerning OARC's movement expense reporting in pre-preliminary results comments filed on November 12, 2024.  *See Administrative Review of Certain Aluminum Foil from Oman – Petitioners' Pre-Preliminary Comments Regarding the Oman Aluminium Rolling Company LLC* (Nov. 12, 2024) ("Pet. Pre-Preliminary Comments") at 29-34, P.R. 82, C.R. 66.

OARC responded to Petitioners' Pre-Preliminary Comments on November 21, 2024.  *See Certain Aluminum Foil from Oman:  Response to Petitioners' Pre-Preliminary Comments* (Nov. 21, 2024) ("OARC's Pre-Preliminary Rebuttal Comments"), P.R. 84, C.R. 67.   In its Pre-Preliminary Rebuttal Comments, OARC emphasized that, notwithstanding Petitioners' repeated critiques of its freight expense reporting, on the cusp of the deadline for the *Preliminary Results*, Commerce "has not determined that it requires further information from OARC to clarify

5

the movement expenses reported in its Section C Response." *Id*. at 21.  OARC further stated, based on its Section C Response that, "{w}ith the exception of **[                    ]** missing freight data in SAP, OARC reported freight on an actual delivery basis, so OARC had no freight allocation calculation to explain to the Department," and reiterated that "for **[**

 **]** with missing freight data in SAP, it reported POR average freight expenses." *See id*. at 22-23. OARC also identified where in its Section C questionnaire response it had reported movement expenses. *See id*. at 23.

Despite having received Petitioners' comments and OARC's responses, prior to the *Preliminary Results*, Commerce never requested any additional information or clarification from OARC regarding its reporting of movement expenses in its Section C Response.

On December 6, 2024, Commerce preliminarily determined an estimated weighted-average dumping margin of 5.84 percent for OARC.  *Certain Aluminum Foil From the Sultanate of Oman:  Preliminary Results of Antidumping Duty Administrative Review:  2022-2023*, 89 Fed. Reg. 100,976 (Dec. 13, 2024) ("*Preliminary Results*"), P.R. 95, and accompanying Issues and Decision Memorandum ("PDM"), P.R. 87.

In the *Preliminary Results*, Commerce calculated export price for OARC "based on packed prices to unaffiliated purchasers in the United States."  PDM at 7.  Commerce further explained that it "made deductions, where appropriate, for billing adjustments, (*e.g.*, wrong billing, price difference, short payment, *etc.*), movement expenses (*i.e.*, inland freight to the port of exportation, domestic brokerage and handling in the country of manufacture, international freight, and marine insurance), in accordance with section 772(c)(2)(A) of the Act."  *Id.*  Commerce did not find in the *Preliminary Results* that OARC had failed to supply any of the information that Commerce required for the calculation of the preliminary dumping margin or indicate that there were open

6

issues with respect to OARC's freight expense reporting that required resolution through the solicitation of additional information. *See id.*

In the *Preliminary Results*, Commerce also established a briefing schedule, requiring the submission of case briefs "no later than 30 days after the date of publication of this notice," or by January 13, 2025. *Preliminary Results*, 89 Fed. Reg. at 100,976, P.R. 95. Commerce gave no indication when establishing the briefing schedule of any open factual issues to resolve or further probe.

On December 9, 2024, Commerce posted a memorandum to the record notifying parties that Commerce was tolling the statutory and regulatory deadlines in this proceeding by 90 days. *Tolling of Deadlines for Antidumping and Countervailing Duty Proceedings* (Dec. 9, 2024), P.R. 88.

On January 7, 2025, almost a month after Commerce had established the briefing schedule and only days before the deadline for case briefs, Petitioners requested that Commerce extend the briefing schedule and issue a supplemental questionnaire to OARC. *Administrative Review of Certain Aluminum Foil from Oman – Request for Extension of Briefing Schedule and Supplemental Questionnaire* (Jan. 7, 2025) ("Petitioners' Jan. 7, 2025 Letter"), P.R. 96, C.R. 74. In their letter, Petitioners again alleged that OARC did not demonstrate the accuracy of its movement expenses or report freight service revenue. *See id.* at 3-9. Petitioners claimed that the sales documentation submitted by OARC in its Section A Response showed that OARC allocated certain freight expenses but did not explain the allocation, contrary to OARC's claim that it reported per-unit freight expenses. *See id.* at 3-4. Petitioners also claimed, based on a field in OARC's invoice to its customer listing a separate amount for "freight and insurance," that OARC had obtained unreported freight revenue. *See id.* at 7, 9. Petitioners urged Commerce to extend the briefing

7

**NON-CONFIDENTIAL VERSION**

schedule and to issue a supplemental questionnaire to OARC to resolve these supposed shortcomings in OARC's reporting.  *See id*. at 2.  Petitioners' January 7, 2025 Letter thus represented the third instance of their claims concerning OARC's freight expense reporting over the course of roughly seven months.

On January 10, 2025, just three days after Petitioners filed their letter and one business day before the deadline for case briefs, Commerce suspended the briefing schedule "to evaluate the record and comments submitted to determine whether to issue a further supplemental questionnaire." *Administrative Review of the Antidumping Duty Order on Certain Aluminum Foil from the Sultanate of Oman:  Suspension of Briefing Schedule* (Jan. 10, 2025), P.R. 97.

On the same day, OARC submitted a letter on the record objecting to Commerce's last-minute suspension of the briefing schedule.  *See Certain Aluminum Foil from Oman: Response to Petitioners' Request for Extension of Briefing Schedule and Supplemental Questionnaire and the Department's Suspension of Briefing Schedule* (Jan. 10, 2025), P.R. 98.  In that letter, OARC pointed out that Petitioners' arguments constitute repetition of arguments that Petitioners had already raised twice prior to the *Preliminary Results*.  *See id*. at 4.  OARC further argued that, contrary to Petitioners' claim that OARC's commercial invoice included freight information that did not match OARC's freight reporting for the shipment represented in its Section A Response sales trace exhibit, the sales documents provided in OARC's Section A Response show that the single shipment and associated freight expenses cover two distinct sales transactions and corresponding invoices, which tie to OARC's reported freight expenses and the freight invoices included in the same sales trace exhibit in its Section A Response.  *See id*. at 4-5.

To support the points raised in its January 10, 2025 letter, OARC included a worksheet ("Attachment 1"), citing information already on the record and explaining, through basic

mathematical steps, how the per-unit freight reported by OARC for the two sales ties to the freight

invoices included in the sales trace documents. *See id.* at 4-5, Attachment 1. OARC also pointed

out that, contrary to Petitioners' baseless assertion that the commercial invoice indicates that

OARC had "[                                    ]," the freight information indicated in the commercial

invoice shows that it is for U.S. customs valuation purposes and does not represent a separate

charge to the customer. *See id.* at 5-6.

On April 23, 2025, Commerce accepted OARC's January 10, 2025 submission on the

record pursuant to 19 C.F.R. § 351.301(a), stating that:

> {A}t the time of OARC's January 10, 2025, letter, Commerce was considering
> requesting information relating to the allocation of OARC's freight expenses.
> Based on our intent to inquire further regarding movement expenses, allocations,
> and revenue and OARC's submission of limited information to this effect, but
> considering the unsolicited and untimely nature of OARC's submission, we hereby
> find good cause to extend the time limit for submission of information contained in
> OARC's rebuttal and allow it to remain on the record pursuant to 19 CFR
> 351.301(a).

*Administrative Review of the Antidumping Duty Order on Certain Aluminum Foil from the*

*Sultanate of Oman: Accepting Untimely New Factual Information on the Record and Resumption*

*of Briefing Schedule* (April 23, 2025), P.R. 104.

Commerce issued the *Final Results* on September 8, 2025. *See* 90 Fed. Reg. 44,162, P.R.

123. In the *Final Results*, Commerce found that for the reporting of domestic inland freight

expenses (DINFLTPU), international freight expenses (INTNFR1U/INTFR2U), U.S. inland

freight expenses (INLFWCU), and U.S. customs duty expenses (USDUTYU), OARC failed to

identify that such expenses reflected allocations. *See* IDM at 4-5, P.R. 117. Commerce also found

that OARC's January 10, 2025 submission supposedly "revealed that freight revenues were

included in the gross unit price for certain sales, but not separately broken out as a variable in the

9

sales database," and that "OARC's reporting used an allocation and averaging of per unit freight costs that was not previously explained." *Id.* at 6.

Commerce claimed that OARC (1) had not provided detailed allocation information supporting its movement expenses and (2) failed to provide any information on its collection of freight revenues related to specific freight expenses, which also did not permit Commerce to "cap" freight revenue pursuant to its normal practice. *See id.* at 6-8.

As a result of these alleged deficiencies, Commerce applied partial AFA to OARC. *See id.* at 8, 11. For the alleged failure to provide allocation information supporting its movement expenses, Commerce disregarded OARC's reported per-unit expenses and instead identified OARC's highest reported transaction-specific expense for any reported transaction, and applied that amount as the relevant freight expense incurred for all reported transactions. *See id.* at 8; *see also Antidumping Duty Administrative Review of Certain Aluminum Foil from the Sultanate of Oman: Final Results Margin Calculation for Oman Aluminium Rolling Company* (Sept. 8, 2025) ("Final Calculation Memo"), P.R. 118, C.R. 90.

Additionally, for the alleged failure to report freight revenue for certain freight expenses, as a second component of AFA, Commerce reduced gross unit price for all sales by the percentage difference between the net price (exclusive of freight revenue) and gross unit price (inclusive of freight revenue) for the single sample sale information contained on the record in the sample sales trace provided in Exhibit A-8 of OARC's Section A Response and Attachment 1 included in OARC's January 10, 2025 submission. *See* IDM at 7-8, P.R. 117. Commerce explained that this revised gross unit price "is [                    ] than OARC's reported GRSUPRU." Final Calculation Memo at 2, P.R. 118, C.R. 90.

In applying an adverse inference, Commerce found that "OARC's reporting of sales and cost information otherwise reflected fulsome and cooperative reporting and the scope of the information withheld is limited to only the accuracy of the calculation of per-unit movement expenses and the ability to properly cap service-related revenues to the amount of such expenses…"  IDM at 7, P.R. 117.

As a result of its findings, Commerce assigned OARC a final weighted-average dumping margin of 42.48 percent.  *Final Results*, 90 Fed. Reg. at 44,162, P.R. 123.  This final dumping margin represents a more-than-seven-fold increase in OARC's preliminary margin of 5.84 percent, based on the same record that Commerce used to calculate OARC's preliminary margin.

## SUMMARY OF ARGUMENT

The fundamental question before the Court is whether Commerce lawfully found on the basis of an allegation from Petitioners that OARC concealed a methodology to allocate its freight expenses as well as its receipt of separately negotiated freight revenue, warranting the application of partial AFA and driving a more-than-seven-fold increase in OARC's weighted average dumping margin, while depriving OARC of any opportunity to provide information to clarify the matter. OARC respectfully submits that Commerce's determination in this administrative review amounts to an unduly punitive and unlawful "gotcha" approach of the very sort that this Court has rejected.

As OARC first explains below, the weight of the record evidence compels the conclusion that it properly interpreted and applied the instructions in Commerce's Initial Questionnaire for the reporting of its freight expenses, which did not require OARC to perform or explain any kind of "allocation" given that OARC incurred such expenses on a transaction-specific basis, and properly converted them to a per-unit basis in its expense reporting.  Commerce's conclusion that OARC did not properly explain its allocation methodology conflicts with Commerce's actual reporting instructions and is unsupported by substantial evidence.

11

NON-CONFIDENTIAL VERSION

In the *Final Results*, Commerce found ***for the first time*** in the administrative review that OARC's letter of January 10, 2025 – which rebutted Petitioners' allegation of improper freight expense reporting – revealed a hidden allocation methodology. As the record shows, OARC's letter cited existing record evidence and demonstrated how, exactly, its reported per-unit freight expenses tied to the documents provided in its sample sales trace. Commerce's finding that the January 10, 2025 letter disclosed an allocation methodology is inconsistent with Commerce's own reporting instructions, which required no discussion of an allocation that did not exist, and is thus unsupported by substantial evidence.

Moreover, Commerce's surprise announcement in the *Final Results* that OARC had concealed a freight expense allocation methodology also constitutes an abuse of discretion because Commerce provided OARC with ***no opportunity whatsoever*** to provide new information to clarify its freight expense reporting in light of Petitioners' allegation that OARC had misreported these expenses. Whereas OARC reasonably attempted to rebut Petitioners' allegation in its January 10, 2025 letter, Commerce unreasonably declared "gotcha," penalizing OARC for attempting to defend its reporting on the basis of the existing record rather than investigate the merits of that allegation through the solicitation of more information.

For the first time in the *Final Results*, Commerce also claimed that OARC's January 10, 2025 letter revealed that OARC did not report freight revenue for some unknown number of its U.S. sales. In this respect, too, Commerce's determination is unsupported by substantial evidence because Commerce did not specify where and how that submission provided evidence that OARC separately negotiated freight revenue with its U.S. customers. While Commerce did not adequately explain itself, to the extent that its finding rests on information included in OARC's underlying U.S. sales trace, that information was on the record since the beginning of the administrative

12

review and did not constitute a surprise revelation following the *Preliminary Results*. Commerce's determination is all the more unreasonable because for this finding, too, Commerce provided OARC with *no opportunity whatsoever* to provide new information to rebut Petitioners' allegation concerning supposed freight revenue or to assist Commerce in probing that allegation, even though the allegation arose early in the administrative review.

As OARC further explains below, Commerce's application of partial AFA is unsupported by substantial evidence and otherwise unlawful. First, Commerce violated the instruction of 19 U.S.C. § 1677m(d) that it promptly inform OARC of any deficiency in its freight expense reporting and provide OARC with an opportunity to provide clarifying information. The timeline of the administrative review confirms that Commerce could readily have done so, because Petitioners first raised their allegation upon OARC's submission of its Section C Response. Yet Commerce never did so, instead moving straight past any investigation of the allegation to an unduly punitive application of adverse inferences, as described next.

Additionally, Commerce's determination that the record contains a gap is based on erroneous assumptions and improper inferences from OARC's actual freight expense reporting, which complied with Commerce's instructions. Thus, Commerce did not satisfy the statutory prerequisites for the application of facts available under 19 U.S.C. § 1677e(a).

Moreover, Commerce failed to satisfy the statutory prerequisites, codified in 19 U.S.C. § 1677e(b)(1), for the application of adverse inferences. The clear weight of the record evidence demonstrates that OARC made its best efforts to comply with Commerce's information requests. OARC explained its freight expense reporting methodology pursuant to the guidance specified in the Initial Questionnaire, and Commerce acknowledged that OARC had otherwise provided comprehensive responses to its information requests.

13

Finally, in Section II.D, OARC explains how Commerce compounded its unlawful application of partial AFA through its choice of methodology.  First, Commerce arbitrarily applied its adverse adjustment to OARC's expense reporting not only to OARC's freight expenses, but also to its U.S. duty expenses.  Commerce, however, found no fault with OARC's reporting of its U.S. duty expenses, such that the factual predicate for Commerce's application of partial AFA did not apply.  Second, Commerce unreasonably penalized OARC by applying an AFA methodology that more than doubled OARC's freight expenses, severely inflating the dumping margin as a result.  Together, these two components of Commerce's partial AFA methodology accounted for the lion's share of the seven-fold increase in OARC's weighted average dumping margin – applied by Commerce on the basis of a supposed deficiency in OARC's freight expense reporting that Commerce never permitted OARC to address.  These actions constitute an unreasonable application of partial AFA, particularly in light of Commerce's finding that OARC's reporting was otherwise comprehensive and sound.

## ARGUMENT

### I.    Subject Matter Jurisdiction and Standard of Review

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c). In actions arising under 28 U.S.C. § 1581(c), the Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

For a fact-finding to be supported by substantial evidence, Commerce must identify "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).  "{S}ubstantial evidence is more than a mere

14

**NON-CONFIDENTIAL VERSION**

scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The existence of substantial evidence is determined by a review of the record as a whole, including whatever "fairly detracts" from the agency's determination. *Universal Camera*, 340 U.S. at 488 (providing that the reviewing authority must consider "the record in its entirety . . . , including the body of evidence opposed to the {agency's} view"); *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997). Stated differently, the Court must "determine . . . in the exercise of {its} independent judgment, whether on the whole record the evidence in a given instance is sufficiently substantial to support a finding." *Universal Camera*, 340 U.S. at 484 n.17 (quoting S.REP. NO. 752, at 30-31, *as reprinted in* S. DOC. NO. 248, at 216-217, 279 (1944-46)). The Court "is not barred from setting aside {Commerce's} decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {Commerce's} view." *Id.* at 488.

In making findings of fact, Commerce "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011) (holding that because the agency "failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its . . . determinations, these determinations are not supported by substantial evidence"). While Commerce "need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermine{} its reasoning and conclusion." *Wind Tower Trade Coal. v. United States*, 569 F. Supp.

15

NON-CONFIDENTIAL VERSION

3d 1221, 1248 (Ct. Int'l Trade 2022) (quoting *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) *aff'd*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).  Commerce cannot rely on mere speculation or presumptions unsupported by record evidence to avoid examining relevant evidence.  *See, e.g.*, *OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("'Mere speculation' is not substantial evidence.").  Nor can Commerce treat the absence of evidence as substantial evidence in support of its finding.  *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013).

To render a decision that comports with law, Commerce cannot act arbitrarily or capriciously.  *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision will {} be set aside if it is arbitrary and capricious." (quoting *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012))).  Commerce acts arbitrarily and capriciously if it fails to adequately explain itself, which requires Commerce to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Stated differently, Commerce must provide an "A-to-Z explanation" that "reasonably tie{s} the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretation the agency is adopting and what facts the agency is finding."  *CS Wind*, 832 F.3d at 1376-77; *see* 19 U.S.C. § 1677f(i)(3)(A) ("{T}he administering authority shall include in a final determination . . . an explanation of the basis for its determination that addresses relevant arguments, made by interested parties . . . concerning the establishment of dumping or a countervailable subsidy . . . with respect to which the determination is made.").  Commerce does not satisfy this requirement when it fails

16

NON-CONFIDENTIAL VERSION

to "provide even that minimal level of analysis," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Commerce also commits arbitrary and capricious action when it departs from practice without adequate explanation, *see NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) (remanding to Commerce and explaining that "{o}nce Commerce establishes a course of action . . . Commerce is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary") or fails to adequately explain its disparate treatment of similar situations, *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996))).

Finally, Commerce acts unlawfully when it abuses discretion conferred by statute or regulation. "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

**II.    The Final Results Are Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law**

**A.    Commerce's Finding that OARC Misreported Its Freight Expenses by Concealing Supposed "Allocation" of Those Expenses Is Unsupported by Substantial Evidence and Constitutes an Abuse of Discretion**

In the *Final Results*, Commerce found (for the first time) that OARC failed to notify it in its Section C Response that it had allocated its freight expenses, as Commerce had instructed in its initial questionnaire. Commerce found that OARC's January 10, 2025 letter indicated that "OARC's reporting used an allocation and averaging of per unit freight costs that was not

17

previously explained." IDM at 6, P.R. 117. Commerce's finding that OARC's January 10, 2025 letter revealed a supposed previously hidden "allocation" methodology for its freight expense reporting is, however, unsupported by record evidence in light of Commerce's instructions for the reporting of such expenses.

The record establishes that OARC incurred its freight expenses on a transaction-specific basis, separately for three distinct stages, and reported these expenses for each transaction on a per-unit basis, consistent with Commerce's instructions. Further, OARC's January 10, 2025 letter, on which basis Commerce claimed to have discovered such a previously undisclosed allocation methodology, did not reveal some "allocation" within the meaning of Commerce's questionnaire. Commerce's conclusion to the contrary is unsupported by substantial evidence.

In concluding that OARC had concealed a freight expense allocation methodology, Commerce compounded its reversible error by unreasonably depriving OARC of any opportunity to provide further information to clarify the matter.

### 1. OARC Had No Freight Allocation Calculation Methodology to Explain under the Terms of Commerce's Questionnaire

Commerce's Initial Questionnaire explains that expenses are only "allocated" when they "cannot be tied to a specific sale." Initial Questionnaire at G-10, P.R. 12. In these instructions, Commerce explains that an "allocation" may be required to express expenses, for example, "on a customer-specific basis, product-specific basis, and/or monthly-specific basis." *Id*. These instructions plainly suggest – and it was reasonably for OARC to interpret them to mean – that the concept of "allocation" does not come into play where the expense at issue is incurred on a transaction-specific basis.

Additionally, in its instructions for reporting expense data for the field DINLFTPU, Commerce instructs the respondent to report on the basis of an allocation and to provide the

18

"method of allocation" only "when more than one type or size of merchandise was shipped" – i.e., where it is necessary to attribute a portion of the total expense amount to sales transactions for the merchandise subject to reporting.  *Id.* at C-18 to C-19.  Commerce's instructions for reporting the other expense fields at issue here – INTNFRU, INLFWCU, and USDUTYU – include no such requirement to explain a method of allocation.  *Id.* at C-20 to C-22.

*Separately*, Commerce's Initial Questionnaire instructs respondents, for the field DINLFTPU, to "describe how you derived the freight cost per unit," and for the fields INTNFRU, INLFWCU, and USDUTYU, to "{d}escribe how you calculated the unit cost."  *Id.* at C-19 to C-22.  Thus, while Commerce's instructions concerning allocation pertain to the universe of transactions against which a respondent incurs freight (and certain other) expenses and apply only when a respondent does not incur them on a transaction-specific basis for sales of the subject merchandise, the instructions concerning reporting on a per-unit basis involve the separate calculation of expressing absolute freight expenses on a per-unit basis, i.e., the expense divided by the quantity for a given transaction.  Allocation of expenses to particular transactions and the expression of those expenses on a per-unit basis are thus two conceptually and mathematically distinct reporting issues.

In its Section C Response, OARC explained to Commerce that it incurs freight expenses in three stages, corresponding to movement expenses incurred in Oman (Stage 1), Omani port and shipping line movement expenses (Stage 2), and movement expenses in the United States (Stage 3).  OARC Section C Response at C-21, P.R. 32, C.R. 37.  OARC also explained, for each of the above-referenced fields, that it reported the amounts recorded in OARC's SAP system, with the exception of SEQU [    ], a sample sale, for which OARC's SAP system did not contain freight expenses data and for which OARC, therefore, "calculated and reported POR average freight

19

expenses." *Id.* at C-23, C-25, and C-27.  OARC thus conveyed to Commerce that, with the exception of one observation for which a different approach was required because of the nature of the data available in OARC's records, it reported its freight expenses using the data recorded in SAP for each transaction.  OARC identified SEQU **[    ]** as the one sale, unlike the other sales, requiring an approach other than the reporting of actual shipment-specific freight expenses as stored in OARC's SAP system.

OARC further explained, for each of the above-reference fields, that it reported the expenses in either OMR/MT or USD/MT, depending on the currency in which it had incurred the expenses.  *Id.* at C-23, C-25, and C-27.  Again, the expression of its freight expenses on a per-unit basis is a mathematical function involving the division of each transaction-specific expense, in the relevant currency, by the volume of the transaction – and is unrelated to any allocation (or not) of freight expenses across transactions.

Thus, OARC followed **both** above-described aspects of Commerce's expense reporting instructions, reporting its actual, transaction-specific freight expenses, for which no allocation was required, on a per-unit basis.

Commerce even acknowledged that OARC explained that its expenses were not allocated because it had reported actual per-unit freight expenses for each sale of subject merchandise, as instructed in Section C of the Initial Questionnaire.  IDM at 11, P.R. 117.[2]  Commerce's acknowledgement reflected OARC's explanation, in its Pre-Preliminary Rebuttal Comments, that "{w}ith the exception of **[                    ]** missing freight data in SAP, *OARC reported freight on an actual delivery basis, so OARC had no freight allocation calculation to explain to the*

---

[2] Commerce found:  "While OARC is correct that we failed to notify it of any deficiencies in the movement expense reporting, we did not notify OARC because it claimed its expenses were not allocated."  IDM at 11, P.R. 117.

20

NON-CONFIDENTIAL VERSION

*Department*." OARC Pre-Preliminary Rebuttal Comments at 22-23 (emphasis added), P.R. 84, C.R. 67.

For these reasons, the weight of the record evidence before the Court reflects that there was no allocation methodology underlying its freight expense reporting for OARC to explain (beyond the special method required for the sample sale with no associated SAP freight expense records), and that OARC reported these actual expenses for individual transactions on a per-unit basis, consistent with Commerce's instructions.

Thus, Commerce's finding of previously unexplained "allocation and averaging of per unit freight costs" rests on a faulty analysis unsupported by the record. At any rate, as explained further below, to the extent that Commerce was not satisfied with OARC's freight expense reporting, it could have solicited additional factual information on the issue, as the law requires.

### 2.    OARC's January 10, 2025 Letter Did Not Reveal a Hidden Allocation Methodology

OARC's January 10, 2025 letter nowhere used the term "allocation" and nowhere described any purported allocation. Rather, in this letter, in relevant part, OARC responded to an allegation from Petitioners that the freight documents provided by OARC in Exhibit A-8 did not match the freight reported for the relevant transaction, SEQU [    ], which corresponds to commercial invoice [          ] on page 8 of that exhibit. OARC January 10, 2025 Letter at 4, P.R. 98, C.R. 75. OARC then explained in its January 10, 2025 letter, on the basis of existing record information, why Petitioners were wrong and how Commerce could ascertain that OARC had reported correct, matching per-unit expenses for the single shipment and commercial invoices at issue here, using the mathematical function described above for expressing expenses for a given transaction on a per-unit basis. OARC's letter explained:

> Examination of Exhibit A-8 in its entirety…reveals that *the single reported shipment* and associated freight expenses cover two distinct sales transactions and

21

corresponding invoices, SEQU [  ] and SEQU [  ], which correspond to commercial invoice [          ].  Commercial invoice [          ] is also included in Exhibit A-8, at page 25, along with U.S. Customs and Border Protection ("CBP") Entry Summary [              ], at pages 22-23, and Sea Waybill [                  ] at pages 18-19.  Together, these documents demonstrate that the containers associated with these two commercial invoices ([          ] and [          ]) comprised a single shipment and entry.  Extending the per-unit freight reported on SEQU [  ] and [  ] in the fields DINLFTPU, INTNFR1U, and INLFWCU by multiplying by the associated sales QTYU and summing the amounts *clearly shows that OARC's reported freight charges for the two sales do, in fact, tie to the freight invoices included in Exhibit A-8*.  OARC provides at **Attachment 1** a worksheet demonstrating this calculation.

*Id*. at 5 (emphasis added; citations omitted).  Thus, in rebuttal to Petitioners' allegation, and in the absence of requests for further information from Commerce, OARC demonstrated how record evidence confirmed that the sales trace documents provided in Exhibit A-8 tied to its sales expense reporting for the single shipment at issue here.

OARC's above-quoted rebuttal to Petitioners' allegation is entirely consistent with OARC's explanation that it had reported actual per-unit freight expenses in its Section C Response.  With respect to the specific commercial invoice identified by Petitioners, OARC simply illustrated in Attachment 1 to its January 10, 2025 Letter how it had determined the per-unit freight expenses that it had reported to Commerce for the single shipment at issue in Exhibit A-8, and did not reveal some allocation methodology that OARC had applied to its transaction-specific freight expense reporting.  No allocation was involved because, consistent with the instructions in Commerce's questionnaire at G-10, and consistent with OARC's explanation in its Section C Response, OARC reported transaction-specific, per-unit freight expenses.  Indeed, the above-quoted discussion concerns the identification of freight expenses for a "single reported shipment," contains no information pertaining to any other shipment, and does not reveal any departure from OARC's explanation of its freight expense reporting.  Thus, Commerce could not reasonably characterize

22

OARC's explanation in its January 10, 2025 letter as revealing a previously concealed "allocation" methodology.

Because OARC followed Commerce's sales expense reporting instructions, had no allocation methodology to report, and did not reveal any such methodology in its January 10, 2025 Letter, Commerce's finding to the contrary is unsupported by substantial evidence. At any rate, to the extent that Commerce was not satisfied with OARC's freight expense reporting, it could have solicited additional factual information on the issue, as the law requires. Indeed, in its April 23, 2025 letter, P.R. 104, Commerce admitted that it was considering seeking clarifying factual information on OARC's freight expense reporting. Instead of doing so, however, Commerce unreasonably jumped to its punitive inference that OARC had concealed an allocation.

### 3.      Commerce Abused Its Discretion by Depriving OARC of Any Opportunity to Clarify Its Freight Reporting Methodology

Notwithstanding the passage of nearly 15 months between Petitioners' first critique of OARC's freight expense reporting methodology and Commerce's determination that OARC had allegedly hidden a freight expense allocation methodology, Commerce provided OARC with ***no opportunities whatsoever*** to provide factual information to clarify the matter.

OARC explains below, in Section II.C.3, why Commerce's refusal to solicit any further factual information from OARC in this regard runs afoul of the statutory requirement, under 19 U.S.C. § 1677m(d), to provide a respondent with an opportunity to rectify a claimed defect in the record. Commerce's punitive investigative approach here is closely analogous to the one reversed by the Court in *Böwe-Passat v. United States*, 17 Ct. Int'l Trade 335 (1993). In that case, Commerce issued a "deficiency letter" to the respondent, Böwe, but ultimately applied adverse inferences on grounds unrelated to the letter. The Court found that "Böwe was misled into believing that it had satisfied its burden regarding certain expenses by the absence of specific

23

mention or concern for those items in the deficiency letter Commerce did decide to issue." *Id.* at 343. Here, similarly, Commerce did not notify OARC of any deficiencies in its reporting of freight expenses, instead "effectively retreat{ing} into its bureaucratic shell, poised to penalize" OARC for alleged reporting deficiencies not specified in the *Preliminary Results* or in any other notification to OARC. *Id.*

Apart from its violation of that statutory obligation, Commerce's refusal to provide OARC with any opportunity to clarify the record on this point represents a reversible "unreasonable judgment in weighing relevant factors." *Star Fruits*, 393 F.3d at 1281. The unreasonableness of Commerce's stance is underscored by OARC's efforts to rebut Petitioners' allegations, as evidenced by its January 10, 2025 letter attempting to do so on the basis of the existing record, Commerce's admission that OARC otherwise provided "fulsome and cooperative reporting," IDM at 7, P.R. 117, and the fact that Commerce had not previously expressed any concerns about OARC's freight reporting or that OARC might have earned separately negotiated freight revenue. These factors confirm that Commerce abused its discretion when it deprived OARC of any opportunity to inform the record on this matter before Commerce penalized it with a seven-fold increase in its weighted-average dumping margin.

For this abuse of discretion, too, OARC respectfully asks the Court to remand the contested determination to Commerce to further develop the record in a manner that is even-handed and procedurally fair to OARC.

**B.    Commerce's Conclusion That OARC Concealed Supposed Freight Revenue Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

In the *Final Results*, Commerce also found that OARC's January 10, 2025 letter "revealed that freight revenues were included in the gross unit price for certain sales, but not separately broken out as a variable in the sales database." IDM at 6 and 11, P.R. 117. In reaching this adverse

24

finding, however, Commerce ignored its own longstanding practice, which Commerce itself described in the *Final Results*, of finding freight revenue when "the record contains evidence that the service was negotiated between seller and buyer{} and that the revenues do not exceed the expenses." *Id.* at 12. Under the standard as articulated by Commerce in the *Final Results*, Commerce's finding is arbitrary and capricious because Commerce did not explain its conclusion, such as with specific references to particular statements or data how OARC's January 10, 2025 letter purportedly revealed the existence of unreported freight revenue. *See id.* at 7 and 11. Stated differently, Commerce nowhere provided the requisite A-to-Z explanation regarding *how* the January 10, 2025 letter supported its finding.

Aside from this fundamental defect in Commerce's reasoning, its explanation of the relevance of the January 10, 2025 letter to its finding of previously undisclosed freight revenue appears to rest on an unexplained leap of logic. In the *Final Results*, Commerce found that OARC's January 10, 2025 letter disclosed "an allocation and averaging of per unit freight costs that was not previously explained *and which revealed that freight revenues were included in the gross unit price for certain sales*." *Id.* at 6 (emphasis added). While OARC disagrees that it divulged any previously hidden allocation of freight expenses in its January 10, 2025 letter, for the reasons set forth above in Section II.A, Commerce's finding is illogical and thus unsupported by the record because, even if OARC had allocated its freight expenses and explained its method of allocation, such explanation would not have revealed the existence (or absence) of freight revenue. This is because, whether or not a respondent allocates incurred expenses in order to report those expenses on a transaction-specific, per-unit basis is a fundamentally different issue from whether or not a respondent negotiates with its customers in order to derive revenue from incurring such expenses. Commerce, thus, had no basis to find that OARC's use (or non-use) of an allocation

25

NON-CONFIDENTIAL VERSION

methodology had any bearing on whether OARC separately negotiated freight services with its customers. Commerce's finding thus amounts to a *non-sequitur*, and is reversible unlawful error under the Court's standard of review for lack of "a rational connection between the facts found and the choice made." *Timken U.S. Corp.*, 421 F.3d at 1355 (Fed. Cir. 2005).

Alternatively, to the extent that Commerce's finding of the supposed revelation of unreported freight revenue in the January 10, 2025 letter was based on the existence of a freight and insurance-related field in OARC's commercial invoice provided in Exhibit A-8, P.R. 20, C.R. 4, which Commerce did not reference in the *Final Results*, there is no evidence on the record that this field reflects negotiations with OARC's customers for purposes of Commerce's "service was negotiated" standard. To the contrary, the commercial invoice on its face clearly indicates that the freight and insurance amounts noted in the invoice are "details for import duty calculation," *id.*, and are thus provided for U.S. customs compliance purposes, and do not reflect a separate charge to the customer – much less evidence of an actual separate negotiation of that charge. Thus, this potential basis for Commerce's explanation also fails under the substantial evidence standard.

Additionally, to the extent that Commerce rested its finding of OARC's previously undisclosed freight revenue reporting on the above-referenced portion of the invoice included with OARC's U.S. sales trace, provided in its April 26, 2024 Section A Response (Exhibit A-8), such reliance would be disingenuous because this document had been on the record *for over seven months* when Commerce issued the *Preliminary Results* and for roughly *sixteen months* when Commerce issued the *Final Results*. Moreover, as explained above, Petitioners had repeatedly made their allegation of supposedly unreported freight revenue. Commerce could have – but never did – solicit information from OARC to explore Petitioners' allegation, and chose instead to

26

penalize OARC in a "gotcha" maneuver of the sort that the Court rejected in *Böwe-Passat*. *Böwe-Passat*, 17 Ct. Int'l Trade at 343.

> **C.    Commerce's Application of Partial AFA in Its Calculation of OARC's Export Price Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

In the *Final Results*, Commerce applied partial AFA in its calculation of OARC's export price, finding that the record did not include sufficient information on the allocation of OARC's movement expenses and that OARC had failed to provide information on its collection of freight revenue related to specific freight expenses. On these purported bases, Commerce determined that OARC withheld information, failed to provide information by the established deadlines, and significantly impeded the proceeding. IDM at 6, P.R. 117. Commerce further found that OARC had failed to comply with its information requests to the best of its ability, justifying the application of adverse inferences. *Id*. at 7-8.

The Court should reject Commerce's findings for lack of compliance with the statutory prerequisites for the application of AFA under 19 U.S.C. §§ 1677e and 1677m(d) and (e). As an initial matter, Commerce must afford a party an opportunity to remedy deficiencies in its reported information. *See* 19 U.S.C. § 1677m(d) and (e). When the party fails to cure the purported defects, Commerce may rely on "facts otherwise available," but only if it finds that necessary information is not available on the record, or when an interested party withholds requested information, fails to provide requested information by the deadlines for submission or in the form and manner requested, significantly impedes a proceeding, or provides information that cannot be verified. *See* 19 U.S.C. § 1677e(a); *PAM S.p.A. v. United States*, 32 Ct Int'l Trade 779, 780-81 (2008) (providing an overview of the circumstances under which Commerce applies AFA). To the extent that Commerce elects to utilize facts otherwise available with an adverse inference, or AFA, Commerce

27

must also find that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce.  *See* 19 U.S.C. § 1677e(b)(1).

Commerce had no lawful basis to apply facts available, much less AFA, to OARC in this review.  As set forth below, the Court should find that Commerce (1) failed to provide OARC with the statutorily required opportunity to remedy supposed defects in its reporting, (2) did not lawfully resort to facts available, and (3) even if it did, was not justified in applying adverse inferences.

### 1.    Commerce Failed to Provide the Required Opportunity for OARC to Cure the Claimed Defect in the Record

As emphasized throughout this brief, Commerce never afforded OARC an opportunity to remedy any supposed deficiency in its reporting of its freight expenses.  In the *Final Results*, Commerce admitted that it "did not solicit additional information" on this issue, IDM at 11, P.R. 117, notwithstanding Petitioners' repeated suggestions since long before the *Preliminary Results* that it do so.  The statute, however, required Commerce to solicit further information from OARC upon its finding of a supposed gap in the record, rendering the *Final Results* unlawful.

19 U.S.C. § 1677m(d) provides, in relevant part, as follows:

> If the administering authority…determines that a response to a request for information under this subtitle does not comply with the request, the administering authority…***shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency*** in light of the time limits established for the completion of…reviews under this subtitle.

(emphasis added).  In other words, ***Commerce cannot lawfully apply facts available, let alone AFA, without first "promptly inform{ing}" a respondent of the apparent deficiency and "to the extent practicable, provid{ing} . . . an opportunity to remedy or explain the deficiency."***  *See id.*; *see also* 19 U.S.C. § 1677e(a) (noting that Commerce's use of facts available under Section 1677e(a) is "subject to section 1677m(d) of this title"); *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1326 (Ct. Int'l Trade 2021) ("The law requires that Commerce must comply with

28

the notice and remedial requirements of § 1677m(d) before it may use facts available."). "Courts have found that Commerce satisfies its obligation under § 1677m(d) to place the respondent on notice of the nature of a deficiency in its initial questionnaire response where a supplemental questionnaire 'specifically point{ed} out and request{ed} clarification of {the} deficient responses,' and identified the information needed to make the required showing." *Hyundai Steel*, 518 F. Supp. 3d at 1322-23 (citing *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)); *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1346 (Ct. Int'l Trade 2018). Commerce failed to satisfy its statutory obligation here.

Commerce stated in the *Final Results* that it did not solicit further information from OARC concerning its freight expense reporting because the alleged deficiency only came to light in OARC's January 10, 2025 letter. IDM at 11, P.R. 117. This stated justification does not, however, stand up to scrutiny, because Petitioners had repeatedly alleged the deficiency (rebutted by OARC each time) since the submission of their comments on OARC's Section C response, six months prior to the *Preliminary Results*. Petitioners renewed their allegation in pre-preliminary results comments, and then again in their post-preliminary results plea for suspension of the briefing schedule and issuance of a supplemental questionnaire to OARC. Commerce April 23, 2025 Letter, P.R. 104. Thus, the parties to the administrative review had been litigating Petitioners' allegation concerning OARC's freight expense reporting intensively for many months prior to Commerce's purported discovery of OARC's supposed allocation methodology. ***Never once*** during this extended period, however, did Commerce issue a supplemental questionnaire on this issue to OARC, depriving it of any opportunity to fully address Petitioners' allegation.

Moreover, when it accepted OARC's January 10, 2025 letter, Commerce indicated that, at the time of its submission, it was considering issuing a supplemental questionnaire to OARC, yet

29

it declined to do so.  P.R. 104.  Commerce made its determination to accept OARC's letter on April 23, 2025, well over three months following its submission.  Thus, in addition to the many months prior to the *Preliminary Results* during which Commerce could have sought further information from OARC in response to Petitioners' allegation, it had ample time to do so following the *Preliminary Results*.  Yet, Commerce chose never to afford OARC that opportunity.

For these reasons, Commerce plainly violated the dictates of 19 U.S.C. § 1677m(d) to promptly inform OARC of any deficiency in its freight expense reporting and to provide it with an opportunity to provide clarifying information.  Moreover, consideration of the timeline since Petitioners first raised their allegation of supposed deficiencies in OARC's freight expense reporting demonstrates that Commerce had ample time to do so, such that it would have been "practicable" for Commerce to do so for purposes of Section 1677m(d).

OARC therefore respectfully asks the Court to instruct Commerce to apply Section 1677m(d) on remand in the event that Commerce, upon reconsideration, finds any deficiencies in OARC's freight expense reporting.

### 2.    Commerce Lacked Authority to Rely on Facts Available

Commerce had no lawful basis to rely on facts available in the first place (with or without adverse inferences) because the record contained no gaps, and OARC provided all information necessary for Commerce to calculate a dumping margin (as Commerce did in the *Preliminary Results*) without resorting to facts available.  Commerce's contentions to the contrary are unsupported by record evidence and otherwise not in accordance with law.

19 U.S.C. § 1677e(a) provides, in relevant part, as follows:

If—

(1) necessary information is not available on the record, or
(2) an interested party or any other person—

30

(A) withholds information that has been requested by the administering authority…under this subtitle,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle…

the administering authority…shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the appliable determination under this subtitle.

In the contested *Final Results*, Commerce found that OARC did not provide "detailed allocation information supporting its claimed movement expenses{ } by the deadlines established" or "information on its collection of freight revenues related to specific freight expenses," supposedly satisfying the above-quoted statutory requirements for the use of facts available. IDM at 6, P.R. 117.

Commerce did not lawfully conclude, however, that the record contained a gap requiring the use of facts available or that OARC's reporting otherwise fell short of the standards specified in Section 1677e(a). Commerce's finding that the record did not include the information needed to confirm the accuracy of OARC's freight expenses rests on the assumptions that (1) OARC had allocated these expenses but failed to disclose that it had done so, and that (2) OARC had collected freight revenue based on the provision of freight services that it had purportedly negotiated with its customers. *See id.* Both of these assumptions are unsupported by substantial evidence.

First, as discussed above in Section III.B, OARC did not, in its January 10, 2025 letter, reveal a previously undisclosed allocation of its freight expenses. Instead, in rebutting Petitioners' claims that its freight expense reporting did not tie with sample sales trace documents provided in its Section C Response for a single shipment, OARC demonstrated – on the basis of existing record evidence as accepted by Commerce – how it had calculated its per-unit freight expenses for that shipment, and that those per-unit expenses did indeed match OARC's reporting for the transaction identified by Petitioners. This identification of per-unit expenses – i.e., the volume of the

31

transaction divided by the associated freight expense – is not tantamount to an "allocation" and is entirely consistent with OARC's explanation, in its Section C Response, that it reported its actual freight expenses incurred, on a per-unit basis, for each U.S. sale. Commerce's finding thus represents a lack of "a rational connection between the facts found and the choice made." *Timken U.S. Corp.*, 421 F.3d at 1355. Even if there was a gap in the record, as explained, the statute required Commerce to afford OARC with the opportunity to provide clarifying information.

Second, Commerce identified a supposed gap in the record in OARC's reporting of freight revenue despite ***the complete absence*** of any record evidence of freight service negotiations with OARC's customers that would suggest the existence of such revenue. Commerce found that "OARC has withheld {such} information," IDM at 6, P.R. 117, but Commerce could not reasonably have found that OARC withheld documentation when Commerce had no record evidence of the existence of any freight service negotiations between OARC and its customers. Indeed, ***at no point in the administrative review*** – notwithstanding Petitioners' repeated requests that Commerce issue supplemental questionnaires on this point – did Commerce issue an information request to OARC specifically seeking information on any freight service negotiations or offering OARC an opportunity to address the issue.

When these erroneous assumptions are rectified, the record is complete, as demonstrated by Commerce's ability to calculate a preliminary margin for OARC without the need to gap-fill through the use of facts available, and with no mention of any supposed deficiencies in OARC's reporting. Because of its reliance on these erroneous assumptions, Commerce's resort to facts available under Section 1677e(a) is unsupported by substantial evidence and otherwise not in accordance with law.

32

NON-CONFIDENTIAL VERSION

### 3.    Commerce Lacked Authority to Apply Adverse Inferences

In the *Final Results*, Commerce found it "necessary" to apply adverse inferences because OARC had purportedly failed to (1) "clearly identify the nature of the per-unit movement expense reporting to allow for greater scrutiny of the allocation," (2) "provide the calculations of per-unit allocations required by the Initial Questionnaire to evaluate proper methodology and accurate calculation," and (3) "identify freight revenues to assess whether expenses are appropriately capped to service-related revenues." IDM at 7, P.R. 117. For these reasons, Commerce concluded that OARC did not act to the best of its ability in reporting its freight expense information. *Id.* For the reasons explained above, OARC contests each of Commerce's predicates for the application of AFA as unsupported by substantial evidence and otherwise not in accordance with law. However, even if the Court finds that Commerce was justified in finding that OARC's reporting left a gap in the record, it should not uphold Commerce's application of adverse inferences in light of OARC's cooperation with Commerce's information requests and the lack of opportunity that Commerce afforded OARC to clarify the record on the deficiencies alleged by the Petitioners.

19 U.S.C. § 1677e(b)(1) provides in relevant part that, if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "(A) may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" and "(B) is not required to determine, or make any adjustments to, a…weighted average dumping margin based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information." As this Court has explained, "{t}he 'adverse inference' analysis focuses on the respondent's 'failure to cooperate to the best of its ability, not its failure to provide requested information.'" *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1338 (Ct. Int'l Trade 2020) (quoting *Nippon Steel Corp.*, 337 F.3d at 1381). The key

NON-CONFIDENTIAL VERSION

question is whether "it is reasonable for Commerce to expect that more forthcoming responses should have been made." *Hung Vuong Corp.*, 483 F.Supp.3d at 1338 (quoting *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1383 (Fed. Cir. 2002)) (internal quotation marks omitted). Moreover, this Court has repeatedly emphasized that Commerce cannot simply apply AFA using the same basis for applying facts available; instead, it "must be explicit in its reason for applying adverse inferences," i.e., that the respondent "did not put forth its maximum effort." *Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1380 (Ct. Int'l Trade 2019); *see also Steel Auth. of India v. United States*, 149 F. Supp. 2d 921, 930 (Ct. Int'l Trade 2001). For example, "{i}f {a} respondent claims an inability to comply, in order to apply adverse inferences Commerce must also conclude that the exporter had the ability to comply with the request for information and did not do so." *Id.* at 930.

Under the statute and this Court's well-established precedent, upholding Commerce's determination that there were gaps in the record as substantiated by record evidence and otherwise in accordance with law does not preclude a finding that OARC acted to the best of its ability in interpreting Commerce's questions in a manner consistent with its reporting. Here, the record contradicts Commerce's conclusion that OARC did not act to the best of its ability.

First, as explained in Section VI.A, OARC's initial freight expense reporting complied with the instructions in Commerce's Initial Questionnaire, and OARC had no "allocation" to report within the plain meaning of those instructions. OARC also explained its reporting approach in response to Petitioners' allegations in their Pre-Preliminary Comments, and Commerce appeared to accept OARC's reporting in the *Preliminary Results* because it made no mention of any supposed deficiency in OARC's reporting and expressed no intention to investigate Petitioners' allegation. OARC's January 10, 2025 Letter, following the *Preliminary Results*, simply confirmed

34

what OARC had already explained in rebuttal to Petitioners' allegations, through reference to record information, and it provided no basis for Commerce to find that OARC had not cooperated to the best of its ability in reporting its per-unit expenses.

Second, Commerce found that "OARC's reporting of sales and cost information otherwise reflected fulsome and cooperative reporting." IDM at 7, P.R. 117. At no point during this review did OARC fail to cooperate to the best of its ability or fail to provide Commerce with requested information. *See Hung Vuong Corp.*, 483 F. Supp. 3d at 1338; *Nippon Steel Corp.*, 337 F.3d at 1381. OARC's record of full cooperation with Commerce's information requests, as acknowledged by Commerce, should have led Commerce to afford OARC an opportunity to cure any supposed deficiencies with respect to its freight expense reporting. Commerce denied this opportunity for OARC to defend its interests, when Petitioners' allegation had been before it for *well over a year* when Commerce decided to apply adverse inferences. Commerce's application of AFA is therefore unsupported by substantial evidence.

In justifying its application of adverse inferences to OARC, Commerce quoted the Federal Circuit's decision in *Nippon Steel*, which provides that Commerce may apply adverse inferences "only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made." IDM at 12, P.R. 117 (quoting *Nippon Steel*, 337 F.3d at 1383). Comparison of the circumstances in *Nippon Steel* with the present record, however, underscores differences supporting the conclusion that, in this case, Commerce could not reasonably conclude that OARC did not cooperate to the best of its ability. Specifically, in *Nippon Steel*, the respondent answered requests for certain information by stating that Commerce did not need the information requested for its analysis. As the court described the posture of the issue in that case, citing Commerce, a "reasonable respondent" would at least have attempted to provide the requested

35

information "when it was requested for the second time, rather than telling the Department, without any factual basis to support such a claim that the respondent did not believe the Department needed the information." *Id.* at 1380.

In this matter, as explained above, OARC reasonably considered, in light of the instructions in Commerce's Initial Questionnaire, that it properly did not report any allocation of its transaction-specific freight expenses and reported them, as explained in its Section C Response, on a per-unit basis. OARC then attempted to defend its interests in the face of Petitioners' allegations on the basis of existing record evidence – with no opportunity afforded by Commerce for the provision of any further clarifying information. These facts are unlike those at issue in *Nippon Steel*, and do not reasonably support Commerce's conclusion that OARC declined to cooperate to the best of its ability.

> **D.      Commerce's Application of AFA Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

In the *Final Results*, Commerce unlawfully compounded the above-discussed errors in the misapplication of adverse inferences in two distinct ways. It should not be necessary for the Court to reach these issues if, for the reasons set forth above, it remands the *Final Results* to Commerce for reconsideration of its determination in the first place to apply partial AFA to OARC. In the event that the Court declines to remand the *Final Results* to Commerce on those grounds, OARC submits that the Court should nevertheless instruct Commerce to reconsider its application of AFA to OARC in the following two respects.

> **1.      Commerce Unlawfully Extended Its AFA Adjustment to OARC's U.S. Duty Payments, with Which Commerce Found No Fault**

First, Commerce acted arbitrarily when it applied the highest-value partial AFA adjustment to OARC's reported USDUTYU field, used to capture OARC's payment of U.S. duties imposed under Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862). In the *Final Results*,

Commerce explained – again, for the first time – that it was applying its partial AFA adjustment on the basis of OARC's alleged "deficient reporting of certain movement expenses…" IDM at 8, P.R. 117. Commerce applied this same approach to OARC's reported USDUTYU expenses, even though OARC explained in its Section C Response that its reporting of USDUTYU expenses was separate and distinct from its reporting of freight expenses, and based on U.S. entry data as reported to CBP. Section C Response at C-28, P.R. 32, C.R. 37.

Because Commerce identified no deficiencies in OARC's reporting of its U.S. duty expenses and because Commerce justified its application of adverse inferences on the basis of alleged deficiencies in OARC's reporting of its freight expenses, it was patently unlawful for Commerce to expand its application of adverse inferences to OARC's reporting of its USDUTYU expenses. As discussed above, the statute authorizes Commerce to apply adverse inferences only upon a determination that a respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information…" 19 U.S.C. § 1677e(b). Here, Commerce found no fault with OARC's reporting of its USDUTYU expenses.

Commerce's expansion of its adverse inferences to penalize OARC's U.S. duty reporting – with which Commerce found no fault – is plainly unlawful because the factual predicate for the application of AFA (i.e., a record gap) does not exist. For these reasons, the Court should order Commerce to reverse this expansion of its AFA methodology on remand, should the Court reach this issue.

## 2. Commerce Unreasonably Penalized OARC by Inflating Its Freight Expenses

Second, Commerce erred when it failed in the *Final Results* to cap any supposed freight revenues by the amount of associated freight expenses. As part of its AFA adjustment in the *Final Results*, Commerce reduced OARC's gross unit price by the amount of purported freight revenue.

37

NON-CONFIDENTIAL VERSION

As put by Commerce, it "did not credit OARC's inclusion of unverifiable service-related revenues in the gross unit price." IDM at 7, P.R. 117. Commerce explained that it reduced OARC's gross unit price for all sales by the percentage difference between the net price (exclusive of freight revenue) and gross unit price (inclusive of freight revenue) for the sample sale included in OARC's Exhibit A-8 and the sales information pertaining to the same transaction included in OARC's January 10, 2025 Letter. *Id.* at 8; *see also* Final Calculation Memo at 2, P.R. 118, C.R. 90. This reduction in OARC's gross unit price, by **[     ]** percent, by itself significantly increasing the weighted average dumping margin, represented one step in Commerce's application of adverse inferences.

Commerce took a second distinct step in its AFA methodology, that is, deducting from gross unit price a higher quantum of freight expenses than OARC had reported for its individual U.S. sales transactions. Commerce explained that it "identified the highest reported transaction-specific expense for any reported transaction" as reported by OARC in its Section C Response and "applied that amount as the relevant movement expense incurred for all reported transactions." IDM at 9, P.R. 117; see also Final Calculation Memo at 3, P.R. 118, C.R. 90. This second step by itself further increased OARC's weighted average dumping margin, representing a second application of adverse inferences.

In this way, through these two distinct adverse methodologies, Commerce ***both*** reduced OARC's gross unit price for supposed freight revenue without any offset for freight expenses ***and*** deducted the full amount of OARC's reported freight expenses by an inflated measure of OARC's reported expenses. The roughly seven-fold increase in OARC's weighted average dumping margin from the *Preliminary Results* to the *Final Results* is largely attributable to these methodological choices.

**NON-CONFIDENTIAL VERSION**

Commerce's approach was unduly punitive to OARC, representing another instance of Commerce's "unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C.*, 393 F.3d at 1281. Again, OARC maintains that it was unlawful for Commerce to apply its revenue-capping methodology in the absence of any record evidence that OARC actually negotiated service revenue with its U.S. customers and without providing any opportunity for OARC to inform the record on this issue. At a minimum, to properly apply this methodology and render a "reasonable judgment" under the *Star Fruits* standard on the record here, Commerce was required to offset the freight expenses reported by OARC by the amount of the freight revenue deducted from the gross unit price. IDM at 12, P.R. 117; *see, e.g.*, *ABB, Inc. v. United States*, 273 F. Supp. 3d 1200, 1208-09 (Ct. Int'l Trade 2017). Under this practice, because Commerce identified an amount by which the gross unit price should be reduced due to purported included charges for freight, Commerce should also have offset the freight expenses by this freight revenue amount, subject to the capping of such freight revenue with the amount of freight expense. Instead, on top of applying adverse inferences *both* in its estimation of OARC's freight revenue deducted from gross unit price *and* in its upward revision of OARC's freight expenses that it also deducted from gross unit price, Commerce did not even apply the offset methodology that is the essence of the "revenue capping" practice that it deemed (for the first time in the *Final Results*) to be required and arbitrarily departed from what it claims to be the applicable methodology. *SKF USA Inc.*, 263 F.3d at 1373-74 (Fed. Cir. 2001) In this way, Commerce illogically and greatly exaggerated the adverse impact on OARC's weighted average dumping margin.

Commerce nowhere in the *Final Results* articulated a basis for declining to apply its "revenue capping" practice, a defect that on its own warrants remand due to the absence of an adequate explanation. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Indeed, Commerce could readily

39

have done so using its adverse estimate of OARC's freight revenue and its inflated measure of OARC's reported freight expenses.

These two elements of Commerce's AFA methodology, standing alone, significantly and adversely impacted OARC's weighted average dumping margin, accounting for much of its seven-fold increase.  Commerce's additional failure to apply its "revenue capping" practice by offsetting OARC's freight expenses by supposed freight revenue then exaggerated the adverse impact to OARC to a disproportionate and unreasonable degree – particularly given Commerce's observation that "OARC's reporting of sales and cost information otherwise reflected fulsome and cooperative reporting."  IDM at 7, P.R. 117.

For these reasons, in the event that the Court reaches this issue, it should remand to Commerce for reconsideration of its application of adverse inferences in light of Commerce's practice of offsetting freight expenses by freight revenue, subject to the cap.

NON-CONFIDENTIAL VERSION

**CONCLUSION**

For the reasons set forth above, Commerce committed reversible error when, without providing OARC with any opportunity to cure supposed defects in its freight expense reporting, and supposed failure to report freight revenue, and acceding to allegations from Petitioners, it penalized OARC with partial AFA in the *Final Results*.  The law required Commerce to solicit factual information to allow OARC to rebut Petitioners' allegation and clarify the matter – which had been before Commerce since early in the administrative review.  Commerce's investigative approach constituted an impermissible "gotcha," and the Court should remand for lawful disposition of the matter.

Respectfully submitted,

 /s/ Bernd G. Janzen
Bernd G. Janzen
Yujin K. McNamara
Devin S. Sikes
Sydney L. Stringer
Sarah P. Tinaphong
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006
bjanzen@akingump.com

*Counsel for Plaintiff Oman Aluminium Rolling Company SPC*

Dated:  April 8, 2026

41

## CERTIFICATE OF COMPLIANCE

I, Bernd G. Janzen, an attorney with Akin Gump Strauss Hauer & Feld LLP, certify that Plaintiff's Memorandum in Support of Its Rule 56.2 Motion for Judgment on the Agency Record contains 12,376 words (according to the word count feature of the Microsoft Word processing program) and therefore complies with the word count limitation set forth in Paragraph 2(B)(1)(a) of the Standard Chambers Procedures of the Court.

 /s/ Bernd G. Janzen
Bernd G. Janzen

April 8, 2026

*Counsel for Plaintiff Oman Aluminium Rolling Company SPC*