NONCONFIDENTIAL

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| OMAN ALUMINIUM ROLLING COMPANY SPC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| DAIKIN COMFORT TECHNOLOGIES ) | |
| NORTH AMERICA, INC., ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | Court No. 25-00215 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ALUMINUM ASSOCIATION TRADE ) | |
| ENFORCEMENT WORKING GROUP et al., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

## <u>DEFENDANT-INTERVENORS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD</u>

R. ALAN LUBERDA
JOHN M. HERRMANN
MATTHEW G. PEREIRA
KELLEY DRYE & WARREN LLP
670 Maine Avenue, SW, Suite 600
Washington, DC 20024
(202) 342-8400

Counsel to the Aluminum Association Trade
Enforcement Working Group et al.

Dated:  July 13, 2026

NONCONFIDENTIAL

# TABLE OF CONTENTS

**Page**

ADMINISTRATIVE DETERMINATION UNDER REVIEW ...................................................... 1

ISSUES PRESENTED............................................................................................................ 2

STATEMENT OF THE FACTS............................................................................................. 3

ARGUMENT....................................................................................................................... 11

    I.        STANDARD OF REVIEW ................................................................................. 11

    II.      COMMERCE'S FINDING THAT OARC FAILED TO EXPLAIN
            TIMELY ITS FREIGHT EXPENSE ALLOCATIONS IS SUPPORTED
            BY SUBSTANTIAL EVIDENCE ...................................................................... 11

    III.     COMMERCE'S FINDING THAT OARC FAILED TO REPORT
            FREIGHT REVENUES AS REQUIRED BY THE QUESTIONNAIRE IS
            SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN
            ACCORDANCE WITH LAW .............................................................................. 15

    IV.     COMMERCE'S APPLICATION OF PARTIAL AFA IS SUPPORTED BY
            SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW ............. 23

         A.     Commerce Did Not Abuse Its Discretion By Not Providing OARC
              With a Further Opportunity to Cure Its Freight Reporting
              Methodology ........................................................................................ 23

         B.     Gaps in the Record Justified the Application of Facts Available ............. 27

    V.      COMMERCE'S APPLICATION OF AN ADVERSE INFERENCE IS
            SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN
            ACCORDANCE WITH LAW .............................................................................. 28

CONCLUSION................................................................................................................... 33

i

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

ABB, Inc. v. United States,
  273 F.3d 1200 (Ct. Int'l Trade 2017)........................................................................13, 18, 32

ABB, Inc. v. United States,
  355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ("2018 ABB, Inc."),
  vacated on other grounds, Hitachi Energy USA Inc. v. United States,
  34 F.4th 1375 (Fed. Cir. 2022) ..................................................................... 20, 21, 24-25

Ad Hoc Shrimp Trade Action Comm. v. United States,
  802 F.3d 1339 (Fed. Cir. 2015)..................................................................................30

Asociacion Colombiana de Exportadores de Flores v. United States,
  704 F. Supp. 1114 (Ct. Int'l Trade 1989),
  aff'd, 901 F.2d 1089 (Fed. Cir. 1990).......................................................................26

Assan Aluminium Sanayi ve Ticaret A.S. v. United States,
  624 F. Supp. 3d 1321 (Ct. Int'l Trade 2024) ...........................................................25

Bowe-Passat v. United States,
  17 Ct. Int'l Trade 335 (1993)....................................................................................25

Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States,
  Ct. No. 23-00264, Slip Op. 26-63, 2026 Ct. Intl. Trade LEXIS 80
  (June 16, 2026)..........................................................................................................24

Hyundai Heavy Indus. v. United States,
  332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ..................................................... 14-15

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ............................................................................................. 22-23

Nippon Steel Corp. v. United States,
  337 F.3d. 1373 (Fed. Cir. 2003)................................................................................28

NMB Sing. Ltd v. United States,
  557 F.3d 1316 (Fed. Cir. 2009)........................................................................... 22-23

Shandong Huarong Gen. Group Corp. v. United States,
  122 F. Supp. 2d 143 (Ct. Int'l Trade 2000) ....................................................... 22-23

NONCONFIDENTIAL

## Statutes and Regulations

19 U.S.C. § 1677a(c)(1)-(3)................................................................17, 18

19 U.S.C. § 1677e(a)(2)(A)-(D) ................................................................9

19 U.S.C. § 1677e(b)(1)................................................................28

19 U.S.C. § 1677m(d)................................................................ 2, 23-25

## Legislative Authorities

Statement of Administrative Action Accompanying the Uruguay Round
  Agreements Act ("SAA"), H.R. Rep. No. 103–316 (1994)................................31, 33

## Administrative Determinations

Certain Aluminum Foil From the Sultanate of Oman:
  Amended Final Results of Antidumping Duty Administrative Review;
  2022–2023, 90 Fed. Reg. 59,792 (Dep't Commerce Dec. 22, 2025) ................................... 1-2

Certain Aluminum Foil From the Sultanate of Oman:
  Final Results of Antidumping Duty Administrative Review; 2022-2023,
  90 Fed. Reg. 44,162 (Dep't Commerce Sept. 12, 2025) ("Final Results")
  (PR 129) and accompanying Issues & Decision Memorandum for the Final
  Results of the Administrative Review of the Antidumping Duty Order on
  Certain Aluminum Foil from the Sultanate of Oman; 2022-2023
  (Sept. 8, 2025) ("Final IDM") (PR 117)........................................................... passim

Certain Aluminum Foil From the Sultanate of Oman:
  Preliminary Results of Antidumping Duty Administrative Review; 2022-2023,
  89 Fed. Reg. 100,971 (Dep't Commerce Dec. 13, 2024) (PR 95)
  ("Preliminary Results") and accompanying Decision Memorandum for the
  Preliminary Results of the Administrative Review of the Antidumping Duty
  Order on Certain Aluminum Foil from the Sultanate of Oman; 2022-2023
  (Dec. 6, 2024) ("PDM") (PR 87)........................................................... passim

Large Power Transformers From the Republic of Korea:
  Final Results of Antidumping Duty Administrative Review; 2013–2014,
  81 Fed. Reg. 14,087 (Dep't Commerce Mar. 16, 2016), and accompanying
  IDM, aff'd, ABB, Inc. v. United States, 273 F. Supp. 3d 1200
  (Ct. Int'l Trade 2017).................................................................... 17-18

**NONCONFIDENTIAL**

Large Power Transformers From the Republic of Korea:
 Final Results of Antidumping Duty Administrative Review; 2016-2017,
 84 Fed. Reg. 16,461 (Dep't Commerce Apr. 19, 2019), and accompanying
 IDM (Apr. 12, 2019)...................................................................................................19

Large Power Transformers From the Republic of Korea:
 Preliminary Results of Antidumping Duty Administrative Review; 2017-2018,
 84 Fed. Reg. 55,559 (Dep't Commerce Oct. 17, 2019), and accompanying
 Preliminary Decision Memorandum (Oct. 9, 2019) ...............................................20

NONCONFIDENTIAL

This response brief is submitted on behalf of the Aluminum Association Trade Enforcement Working Group and its individual members[1] ("Defendant-Intervenors" or "Petitioners") in opposition to the Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record filed by Oman Aluminium Rolling Company SPC ("OARC") and the brief of Plaintiff-Intervenor Daikin Comfort Technologies North America, Inc. ("Daikin"). Defendant-Intervenors request that the Court find that the underlying agency determination is supported by substantial evidence and otherwise in accordance with law. Contrary to OARC's contentions, the United States Department of Commerce ("Commerce") neither blindsided nor otherwise deprived OAR of any opportunity to respond timely to its questionnaire. Rather, OARC failed to report timely, and misled Commerce concerning requested information on its freight-related revenues and expenses. This prevented Commerce from being able to determine the accuracy of reported transportation expenses or to perform its well-established and court-approved capping procedure for determining gross unit price. The application of partial adverse facts available to OARC in this case is supported by substantial evidence and otherwise in accordance with law.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Plaintiff challenges certain aspects of the Commerce's final results in the 2022-2023 annual administrative review of the antidumping duty order on certain aluminum foil from the Sultanate of Oman ("Oman"). The Department's review analyzed imports of subject merchandise that entered the United States between November 1, 2022 and October 31, 2023. See Certain Aluminum Foil From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2022-2023, 90 Fed. Reg. 44,162 (Dep't Commerce Sept. 12, 2025) ("Final Results") (PR 129), and accompanying Issues & Decision Memorandum for the Final

---

[1] Gränges Americas and JW Aluminum.

NONCONFIDENTIAL

Results of the Administrative Review of the Antidumping Duty Order on Certain Aluminum Foil from the Sultanate of Oman; 2022-2023 (Sept. 8, 2025) ("Final IDM") (PR 117); see also Certain Aluminum Foil From the Sultanate of Oman: Amended Final Results of Antidumping Duty Administrative Review; 2022–2023, 90 Fed. Reg. 59,792 (Dep't Commerce Dec. 22, 2025).[2]

## ISSUES PRESENTED

OARC has divided up single issues into multiple related arguments. Defendant-Intervenors summarize the issues before the Court as follows:

1.      Whether Commerce's finding that OARC had unreported and unsupported freight revenue and expenses is supported by substantial evidence on the agency record.

2.      Whether Commerce's application of partial adverse facts available is supported by substantial evidence and otherwise in accordance with law.

3.      Whether Commerce's decision to deny OARC the opportunity to remedy OARC's failure to report properly freight revenue is supported by substantial evidence and in accordance with law.

4.      Whether Commerce's exercise of its gap filling authority under 19 U.S.C. § 1677m(d) for OARC's failure to report freight and duty expenses is supported by substantial evidence and in accordance with law.

5.      Whether Commerce's application of an adverse inference in the application of facts available is supported by substantial evidence and in accordance with law.

---

[2]    Documents in the administrative record are cited by their confidential and/or public record number (i.e., "(CR __)" and "(PR __)") provided in the Index to the Administrative Record filed with the Court on January 5, 2026 (ECF No. 32).

NONCONFIDENTIAL

## STATEMENT OF THE FACTS

Defendant-Intervenors disagree with certain of Plaintiff's characterizations and omissions of record facts set forth its opening brief as further explained below.  See Plaintiff's Br. at 3-8 (ECF Nos. 37-38).

The initial questionnaire sent to OARC contained the following reporting instructions for fields 16 through 21, including Gross Unit Price (Field 18), which were repeated in OARC's response:

> The gross unit price less price adjustments should equal the net amount of revenue received from the sale. *If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge*.

OARC Section C-D Questionnaire Response (May 15, 2024) ("Section C Response") (PR 32-34) (CR 10-16, 37) at C-16 (emphasis added).  Thus, OARC was clearly instructed to report report any separate line items included on the invoice to the customers for shipping (*i.e.*, freight revenue).  [                                                    ] in its initial Section A questionnaire response [

                                                                                    ]  OARC  Section  A Questionnaire Response (Apr. 26, 2024) ("Section A Response") (PR 19-27) (CR 3-8) at Exh. A-8 ([                          ]).  OARC reported no freight revenue in its questionnaire response and did not create a separate field for reporting additional charges.

Nor did OARC's questionnaire responses provide the calculations or documentation to support corresponding movement expenses incurred by OARC and reported in its sales listing despite being instructed to do so in the questionnaire.  Commerce's questionnaire, as repeated by OARC in its response, instructed OARC as follows:

3

> Indicate whether the ocean freight carrier is affiliated. Supply any contracts or tariff rate agreements with carriers that apply to the merchandise under investigation. ***Describe how you calculated the unit cost of ocean freight and include your worksheets as attachments to the narrative response.***

OARC Section C Response at C-24 (PR 32-34) (CR 10-16, 37) (emphasis added). In its questionnaire response, OARC does not describe how it calculated and allocated per-unit international freight for its U.S. sales. For each reported freight expense, for example, (DINLFTPU, INTFRU and INLFWCU) incurred, OARC stated only that it had provided its "SAP system … freight expense." See OARC Section C Response at C-23 (DINLFTPU), C-25 (INTFRU), C-27 (INLFWCU) explaining its freight expense reporting. This described the source of the data, but did not indicate or describe any calculation or allocation undertaken to arrive at a per unit amount. OARC provided no such calculation and made no attempt to show how it tied its per-unit reported U.S. international freight expenses to invoices or OARC's internal systems. It also did not provide the required worksheet demonstrating OARC's calculation method for any reported U.S. movement expenses, despite the Department's explicit instructions to provide a calculation worksheet as an attachment. Thus, OARC led Commerce to believe that the movement expenses reported were those contained in, and directly drawn from, the SAP system – and were not calculated rates requiring further explanation. Final IDM at 11 (PR 117). Based on OARC's deficient reporting, Commerce would ultimately conclude for the final results that:

> for each of the five aforementioned freight variables (DINFLTPU, INTNFR1U, INTNFR2U, INFLWCU, and USDUTYU), OARC failed to plainly identify that such expenses reflected allocations, not transaction-specific unit costs (aside from a reference to inland freight data being unavailable in the sample documentation provided for one sample sale), and failed to provide the requested

4

> worksheets demonstrating its calculation of the allocation where such expense were in fact allocated over a POR-average or multiple transactions, as instructed in the Initial Questionnaire.

Final IDM at 5 (PR 117).

That allocations across sales transactions and per-unit calculations took place would not become apparent to Commerce until after the Preliminary Results when OARC made an admission against interest regarding its reporting of movement expenses. Certain Aluminum Foil From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review; 2022, 89 Fed. Reg. 100,971 (Dep't Commerce Dec. 13, 2024) (PR 95) ("Preliminary Results") and accompanying Decision Memorandum for the Preliminary Results of the Administrative Review of the Antidumping Duty Order on Certain Aluminum Foil from the Sultanate of Oman; 2022-2023 (Dec. 6, 2024) ("PDM") (PR 87).  This became apparent because in comments to Commerce filed prior to the Preliminary Results, Petitioners explained in detail that OARC's response, among other deficiencies, failed to provide the requested freight allocation worksheets and documentation, leaving a gap in the record.  See Petitioners' Pre-Preliminary Comments Regarding the Oman Aluminum Rolling Company LLC (Nov. 12, 2024) (PR 82) (CR 66) ("Petitioners' Pre-Prelim Comments") at 30-32.  OARC responded with a letter on November 11, 2024, claiming that there were no missing calculations because no allocations or calculations had been done by OARC:

> However, in its Section C Response, OARC clearly informed the Department that it reported actual per-unit freight expensess {sic}. With the exception of [                    ] missing freight data in SAP, OARC reported freight on an actual delivery basis, *so OARC had no freight allocation calculation to explain to the Department*.

OARC Response to Petitioners' Pre-Prelim Comments (Nov. 21, 2024) at 22 (PR 84) (CR 67) (footnote omitted; emphasis added).  If OARC had no allocations or calculations, then

NONCONFIDENTIAL

Commerce would have no reason to seek further information on allocations or calculations of OARC's movement expense reporting. As Commerce later explained in its Final IDM, it did not seek further information at that time precisely because OARC's direct statement that it "'had no freight allocation calculation to explain' to Commerce because it used 'actual per-unit' movement expenses from its accounting system.'" Final IDM at 5 (PR 117); see also id. at 11. Commerce expressly stated, "we failed to notify {OARC} of any deficiencies in the movement expense reporting ... because it claimed its expenses were not allocated." Final IDM at 11 (PR 117).

Commerce therefore accepted OARC's freight reporting for the Preliminary Results based on these representations and set a briefing schedule. See Preliminary Results (PR 95) and PDM at 7 (PR 87). On January 7, 2025, four days prior to the scheduled case briefs, Petitioners timely filed a written request that the briefing schedule be delayed and a supplemental questionnaire be sent to OARC to further delve, among other issues, how OARC calculated its reported freight expenses and revenues. Petitioners' Request for Extension of Briefing Schedule and Supplemental Questionnaire (Jan. 7, 2025) at 3-9 (PR 96) (CR 74). Petitioners again explained that the freight and handling charges in OARC's sales trace documentation [

] Id. at 4-5.

Petitioners alleged:

> It is apparent from these figures that **OARC calculated its reported inland freight and ocean freight expenses in a manner that does not match the documentation provided but did not submit its calculations as the Department's questionnaire specifically instructed.**

Id. at 6 (emphasis in original). In response, Commerce suspended the briefing schedule to "properly analyze the petitioners' request." Final IDM at 6 (PR 117).

6

While OARC now complains that this delay was somehow unfair to OARC, there is no evidence that this delay in briefing was in any way detrimental to OARC. Before Commerce could act, OARC responded to Petitioners' allegations on January 10, 2025, and January 31, 2025, and those responses were accepted for the record. OARC Response to Petitioners' Request and DOC Suspension of Briefing Schedule (Jan. 10, 2025) (PR 98) (CR 75-76) ("OARC 1/10/25 Letter" or "January 10 Submission"); OARC Additional Rebuttal Comments (Jan. 31, 2025) (PR 101) (CR 77-78). While OARC fully engaged on this issue in the period after the Preliminary Results were issued, it chose not to brief the issue in its case brief. See OARC Case Brief (Apr. 30, 2025) (PR 105-6). It did brief the issue in its response to Petitioners' case brief, and OARC's rights were not in any way impaired by the delay in briefing. See OARC Rebuttal Brief (May 5, 2025) (PR 109) (CR 82).

What turned out to be detrimental to OARC was its own statements against interest made in its January 10 Submission in opposition to the delay in briefing. Before Commerce could seek additional information or engage in the analysis requested by Petitioners, OARC explained for the first time that it in fact did engage in calculations and allocations when reporting movement expenses, contrary to its claim that there were no calculations or allocations to explain:

> Examination of Exhibit A-8 in its entirety, however, reveals that the single reported shipment and associated freight expenses cover two distinct sales transactions and corresponding invoices, SEQU [    ] and SEQU [    ], which correspond to commercial invoice [          ]. Commercial invoice [          ] is also included in Exhibit A-8, at page 25, along with U.S. Customs and Border Protection ("CBP") Entry Summary [          ], at pages 22-23, and Sea Waybill [          ], at pages 18-19. Together, these documents demonstrate that the containers associated with these two commercial invoices ([          ] and [          ]) comprised a single shipment and entry. Extending the per-unit freight reported on SEQU [    ] and [    ] in the fields DINLFTPU, INTNFR1U, and INLFWCU

7

> by multiplying by the associated sales QTYU and summing the amounts clearly shows that OARC's reported freight charges for the two sales do, in fact, tie to the freight invoices included in Exhibit A-8.

See OARC January 10 Submission at 5 (PR 98) (CR 75-76). OARC then provided a worksheet at Attachment 1 to the letter illustrating these complex allocations and calculations for the two transactions. Id. at Attachment 1 (PR 98) (CR 75-76). OARC's explanation shows that to calculate movement expenses for these two sales, OARC had to link two commercial invoices to a Sea Waybill and a CBP entry summary and divide the total charges for each movement expense by the weights to allocate expenses to each sale. Thus, OARC provided to Commerce direct evidence that OARC had engaged in the very type of calculations and allocations that OARC previously claimed did not exist. OARC's argument, however, still did not address the issue of freight revenue capping raised by Petitioners.

Commerce found the information provided on January 10 by OARC to be new factual information that had been untimely submitted, but nonetheless accepted the document for the record. Memorandum to the File from Alex Cipolla, Accepting Untimely New Factual Information on the Record and Resumption of Briefing Schedule (Apr. 23, 2025) (PR 104). In doing so, however, Commerce did not state that it agreed with OARC's arguments or characterizations of the record. Nor did it state that the information provided satisfied the agency's request for information on the record.

In the Final Results, Commerce found that OARC's claims that it engaged in no freight allocation calculations were disproven by the January 10, 2025 submission of new factual information:

> Thus, for each of the five aforementioned freight variables (DINFLTPU, INTNFR1U, INTNFR2U, INFLWCU, and USDUTYU), OARC failed to plainly identify that such expenses

8

> reflected allocations, not transaction-specific unit costs (aside from a reference to inland freight data being unavailable in the sample documentation provided for one sample sale), and failed to provide the requested worksheets demonstrating its calculation of the allocation where such expense were in fact allocated over a POR-average or multiple transactions, as instructed in the Initial Questionnaire.

Final IDM at 5 (PR 117). Commerce went on to explain that the new information on the record established that OARC's reporting of gross unit price contained freight expenses that were not broken out by variables, as required, and its responses failed to account for associated freight revenues charges to the customer that prevented capping of those revenues:

> However, the freight expense information provided in this submission indicated that OARC's reporting used an allocation and averaging of per unit freight costs that was not previously explained and which revealed that freight revenues were included in the gross unit price for certain sales, but not separately broken out as a variable in the sales database. As a result, the allocated per unit methodology was unaccompanied by documentation supporting the averaging requested by the Initial Questionnaire, and the revelation that allocated per unit costs were reported contradicted prior statements by OARC which suggested that the movement expense reflected actual per unit costs and not allocated costs.[38] Critically, this information also revealed that OARC's reporting methodology does not separately report each freight expense and any associated freight revenue, as appropriate, and, therefore, prevents Commerce from applying its established methodology of capping any service-related revenues when calculating U.S. price.

Final IDM at 6 (PR 117) (footnote omitted).

This omission of "detailed allocation information supporting its claimed movement expenses" and failure to provide "any information on its collection of freight revenues related to specific freight expenses" left a gap in the record. Id. Commerce also found that "OARC has withheld the information, failed to provide it by the deadlines established, and has significantly

9

impeded the proceeding," supporting the application of facts available pursuant to sections 776(a)(2)(A)–(D) of the Act (19 U.S.C. § 1677e(a)(2)(A)-(D)). Id.

In reaching a decision to apply an adverse inference, Commerce determined that "OARC did not exert its maximum effort to provide Commerce with full and complete responses to its requests for information, thereby failing to act to the best of its ability", Final IDM at 7, based on:

- A "failure to identify and support the methodology used to calculate movement expenses and revenues to allow for greater scrutiny," which "amounts to inattentiveness, carelessness, and inadequate record keeping which significantly impeded the proceeding and renders certain movement expense reporting unverifiable"; and

- OARC's claim prior to the Preliminary Results that no calculation or allocation of movement expenses had been done followed by a post-preliminary result revelation that certain movement expenses had been allocated or calculated and freight revenues had been included in price but not separately reported. Id. at 7.

As adverse facts available, Commerce made two adjustments to its margin calculation. First, because service-related revenues were not separately reported, it "reduced gross unit price for all sales by the percentage difference between the net price (exclusive of freight revenue) and gross unit price (inclusive of freight revenue) for the single sample sale information contained on the record in OARC's AQR at Exhibit A-8 and the calculation worksheet untimely provided by OARC in the January 10 Submission." Id. at 8. This eliminated any improper inclusion of uncapped freight revenue in the gross unit price. Second, Commerce "disregarded the unverifiable per-unit expense variables reported, identified the highest reported transaction-specific expense for any reported transaction as reported in OARC's U.S. sales database at Exhibit C-2 of OARC's CQR, and applied that amount as the relevant movement expense incurred for all reported transactions." Id. Thus, Commerce deducted the highest reported sales

NONCONFIDENTIAL

expenses for each disputed variable because OARC had not met its burden to establish entitlement to the claimed price adjustments.  Id.

ARGUMENT

## I.    STANDARD OF REVIEW

Defendant-Intervenors do not object to the standard of review set forth by OARC in its brief but aver that the Final Results are supported by the record evidence and are otherwise consistent with law based on the standard of review as presented.

## II.    COMMERCE'S FINDING THAT OARC FAILED TO EXPLAIN TIMELY ITS FREIGHT EXPENSE ALLOCATIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

The record evidence demonstrates that until after the Preliminary Results were issued, OARC had consistently maintained that OARC had no freight allocation or calculations to explain – a position that it maintains before this Court.  See OARC Brief at 18.  To justify its behavior, OARC attempts to draw a false distinction between an "allocation" of expenses that are not sale-specific and the per-unit calculation of expenses that are sales-specific, based on selectively citing the general instructions in the initial questionnaire.  Id. at 18 (citing Questionnaire at G-10 (PR 12)).  Any reasonable reading of Commerce's instructions as a whole, demonstrates that Commerce has instructed respondents to explain and document allocations and calculations with worksheets tied to internal records.  The hyper-technical distinction between an allocation and a calculation claimed by OARC does not exist in Commerce's regulations or practice.  OARC also cites to no precedent to support its interpretation.

First, instruction II.B of Commerce's questionnaire instructions at G-10, specifically instruct the respondent to "include an explanation of each price adjustment, sales expense, and cost field reported in your databases," which should include "a detailed description of the

NONCONFIDENTIAL

calculation used (including samples)." Initial Questionnaire at G-10 (Instruction II.B). Thus, the idea that OARC did not owe Commerce a description of its per-unit movement expense calculation methodology is not supported by the plain language of the questionnaire.

Second, the initial questionnaire sent to OARC contained a series of specific reporting instructions for movement expenses that contradict OARC's claimed distinction between its obligation to report only allocations but not provide detailed calculations of per-unit expenses. Commerce's questionnaire, as repeated by OARC in its response, instructed OARC to describe how the movement expenses were calculated, using worksheets and examples:

> Indicate whether the ocean freight carrier is affiliated. Supply any contracts or tariff rate agreements with carriers that apply to the merchandise under investigation. ***Describe how you calculated the unit cost of ocean freight and include your worksheets as attachments to the narrative response.***

OARC Section C Response (PR 32-34) (CR 10-16, 37) at C-24 (emphasis added). This requirement to provide detailed calculations of adjustments supported by worksheets was repeated for individual movement expense fields. The instructions for Inland Freight – Plant to Distribution Warehouse, for example states that "{w}here it is necessary to allocate because multiple items were included in a shipment, freight cost should be ***allocated*** on the basis incurred (e.g., weight, volume)." Questionnaire at C-17 (Field 23.0) (emphasis added). Each of the movement expense fields then contains a specific instruction to "{d}escribe how you ***calculated*** the unit cost … and include your worksheets as attachments to the narrative response." Id. at C-17 – C-22 (Fields 23 through 36) (emphasis added). These instructions undermine OARC's claimed distinction between a calculation and an allocation. In both cases, Commerce is

requesting OARC to demonstrate and document the details of the allocations or calculations undertaken to arrive at the reported per-unit expenses.

This is all standard language in Commerce questionnaires, and these instructions meet Commerce's obligation to make clear requests for information. The questionnaire clearly creates an obligation to report and explain any allocated or calculated adjustment, to document the allocation or calculation, and to provide a worksheet demonstrating each such allocation or calculation for a respondent to demonstrate its entitlement to an adjustment. OARC, however, did not meet its corresponding obligation to respond to those requests. As Commerce explained, it is the respondent's burden to establish its entitlement to a price adjustment as the party seeking the adjustment and the party with access to the information supporting the adjustment. Final IDM at 8 (citing ABB, Inc. v. United States, 273 F.3d 1200 1209 (Ct. Int'l Trade 2017) (citing Allied Tube and Conduit Corp. v. United States, 132 F. Supp. 2d 1087, 1093 (Ct. Int'l Trade 2001) and quoting Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1040 (Fed. Cir. 1996)).

That OARC did not meet the reporting requirements of the questionnaire is clear from an examination of the worksheet OARC eventually attached to its January 10 Submission. See January 10, Submission at Att. 1 (PR 98) (CR 75-76). As detailed above, that worksheet and the description of the information ultimately showed that sample documents related to two separate sales (SEQU [          ]) were consolidated into a single shipment and required an allocation of expenses between those sales to calculate a per-unit cost. OARC 1/10/25 Letter (PR 98) (CR 75-76).

> Examination of Exhibit A-8 in its entirety, however, reveals that the single reported shipment and associated freight expenses cover two distinct sales transactions and corresponding invoices, SEQU [   ] and SEQU [   ], which correspond to commercial invoice [          ]. Commercial invoice [          ] is also

> included in Exhibit A-8, at page 25, along with U.S. Customs and Border Protection ("CBP") Entry Summary [              ], at pages 22-23, and Sea Waybill [                    ], at pages 18-19. Together, these documents demonstrate that the containers associated with these two commercial invoices ([          ] and [              ]) comprised a single shipment and entry. Extending the per-unit freight reported on SEQU [    ] and [    ] in the fields DINLFTPU, INTNFR1U, and INLFWCU by multiplying by the associated sales QTYU and summing the amounts clearly shows that OARC's reported freight charges for the two sales do, in fact, tie to the freight invoices included in Exhibit A-8.

Id. at 5. OARC then provided a worksheet at Attachment 1 to the letter illustrating this complex calculation for these two transactions. Id. at Attachment 1 (PR 98) (CR 75-76). This detailed description, repeated in OARC brief to the Court at pages 21-22 of its opening brief, belie any claim that no allocation took place and that the prior record description of its reporting fully explained how per-unit movement expenses were calculated and reported. OARC Opening Brf. at 21-22.

Prior to the January 10 Submission, it was not possible to determine how any of the sales-specific movement expenses were calculated or allocated on a per unit basis since the figures on the documentation provided did not match the figures in the sales listing. The attachment showing that allocation described above goes beyond a simple "mathematical function involving the division of each transaction-specific expense." Id. at 20.

Importantly, OARC's claim that it had no obligation to demonstrate the mathematical functions it employed to arrive at per-unit expenses is also inconsistent with the questionnaire instructions, which expressly require detailed explanations and worksheets. See, e.g., OARC Section C Response at C-24 (INTNFRU) (explaining freight reporting).

"Plaintiff was required to prepare an 'accurate and complete record in response to questions plainly asked by Commerce.'" Hyundai Heavy Indus. v. United States, 332 F. Supp.

14

NONCONFIDENTIAL

3d 1331, 1341 & n.8 (Ct. Int'l Trade 2018) (quoting <u>Tung Mung Dev. Co., Ltd. v. United States</u>, 25 CIT 752, 788-89 (2001) (citing <u>Olympic Adhesives, Inc. v. United States</u>, 899 F.2d 1565, 1571-72 (Fed. Cir. 1990)). OARC's claim that it had sufficiently described its movement expense reporting for purposes of these explicit instructions by a bare claim that it had reported per-unit expenses based on data from its SAP system is inconsistent with the plain questionnaire instructions that required worksheets and a demonstration of the calculations undertaken and with the detailed description of its allocation and calculation methodology it later provided. Commerce, however, never had the opportunity to examine and delve that methodology because it was submitted after the record had closed. The weight of record evidence therefore supports Commerce's finding that the allocation and calculation of movement expenses was not adequately reported by OARC.

III.    **COMMERCE'S FINDING THAT OARC FAILED TO REPORT FREIGHT REVENUES AS REQUIRED BY THE QUESTIONNAIRE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

OARC takes issue with Commerce's finding that "OARC's January 10, 2025 letter 'revealed that freight revenues were include in the gross unit price for certain sales, but not separately broken out as a variable in the sales database.'" OARC Brf. at 24-27 (quoting <u>Final IDM</u> at 6 and 11 (PR 117)). While Commerce could have been clearer, Commerce properly articulated the standard for such a finding and supported it with substantial evidence.

Commerce found that the new information OARC placed on the record "does not separately report each freight expense and an associated freight revenue, as appropriate, and, therefore, prevents Commerce from applying its established methodology of capping any service-related revenues when calculating U.S. price." <u>Final IDM</u> at 6 (PR 117). The

15

NONCONFIDENTIAL

Department found that freight revenues were included in gross unit price but not separately reported:

> The burden was on OARC to establish its entitlement to any favorable adjustment to its U.S. price for freight revenue and to report each expense and any related revenue separately and not to combine them for purposes of revenue capping. However, OARC did not provide separate reporting of expenses and any associated revenues, preventing further scrutiny of the reported movement expenses and related revenues and, therefore, OARC failed to meet its burden of demonstrating its entitlement to such an adjustment. Thus, because service-related revenues were not separately reported, Commerce applies the adverse presumption that sales prices for all transactions are inclusive of such unverifiable offsets, and has reduced gross unit price for all sales by the percentage difference between the net price (exclusive of freight revenue) and gross unit price (inclusive of freight revenue) for the single sample sale information contained on the record in OARC's AQR at Exhibit A-8 and the calculation worksheet untimely provided by OARC in the January 10 Submission.

Final IDM at 7-8 (footnote omitted) (PR 117). Although disagreeing with the characterization of what freight amounts were listed on the invoice, the January 10 submission confirmed the freight revenues documented on the invoice in Exhibit A-8 of OARC's questionnaire:

> Petitioners comment is misleading because the freight stated on OARCs DDP sales invoices, such as the one provided in Exhibit A-8, is provided to CBP for customs valuation purposes, and does not represent an exact amount of freight separately charged to the customer. Because the terms are DDP, freight constitutes part of the overall price agreed with the customer.

January 10, 2025 Letter at 6 (PR 98) (CR 75-76). Regardless of how the invoices might have been used with CBP, they are addressed from OARC to the customer and clearly set forth the parties' expectations of what is being charged for aluminum and freight services. Commerce found the freight amounts assigned on the commercial invoices to be evidence of freight revenue that had not been reported. While Commerce did not repeat the Petitioners' argument as to why

NONCONFIDENTIAL

these separately listed freight amounts should be considered freight revenue, it implicitly did so by summarizing OARC's response to Petitioners' arguments:

> {The p}etitioners' argument with respect to alleged freight revenue is equally meritless. OARC did not report any freight revenue because it had no such revenue to report. {The p}etitioners simply take a reference to "freight and insurance charges" in OARC's sample invoices and speculatively interpret these references to mean that OARC failed to report freight revenue that it had received. However, it is clear from the invoices that the amounts in the "freight and insurance charges" field simply identify the amount of freight that OARC paid for the transaction – consistent with its DDP terms – for purposes of deriving entered value.

Final IDM at 10 (PR 117).  This summary confirms there were freight and insurance charges listed on the customer facing invoice.  While OARC argued these listed freight and insurance charges were not freight revenue assigned to the sale, the Department disagreed:

> Regarding OARC's argument that it did not report freight revenue because it had no such revenue to report, we disagree. OARC claims that the freight it charges to its customers "constitutes part of the overall price agreed on with the customer." However, we agree with the petitioners that the inclusion of freight in the terms of sale is irrelevant to the capping requirement and the necessary reporting thereof.[56] What is relevant is whether the service was provided, that the record contains evidence that the service was negotiated between seller and buyer, and that the revenues do not exceed the expenses to avoid a violation of the requirements of section 772 (c)(2) of the Act. Due to OARC's failure to provide this information, the record does not offer any such information to confirm the veracity of OARC's claims.

Final IDM at 12 (PR 117) (footnote omitted).  Thus, the freight charges listed on the invoice to the customer were properly treated as freight revenue, consistent with Commerce's practice.

Commerce's practice, based on the statute, is to cap freight revenues and other service-related revenues included in gross unit price by the amount of directly-related expenses.  See 19 U.S.C. § 1677a(c)(1)-(3).  This capping is Commerce's methodology for implementing the statutory requirements of 19 U.S.C. § 1677a(c)(2):

> Section 1677a(c)(2) directs Commerce to reduce the price used to establish CEP by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses ... which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2). Commerce offsets respondents' freight expenses with related freight revenues, capping those revenues at the level of the associated expenses. This court previously has deemed Commerce's approach reasonable. <u>Dongguan Sunrise Furniture Co., Ltd. v. United States</u>, 36 CIT-,-, 865 F. Supp. 2d 1216, 1248 (2012) ("Commerce's approach is reasonable under the statute" when it "deducts respondent's freight expenses from { the price used to establish CEP } ... { and } then offsets respondent's freight expenses with related freight revenues, resulting in a net freight expense.")

<u>Large Power Transformers From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2013–2014</u>, 81 Fed. Reg. 14,087 (Dep't Commerce Mar. 16, 2016), and accompanying IDM at 24 (Comment 3) ("For these reasons, as provided in the statute and in line with past practice, we are continuing to cap sales-related revenues to offset ***directly associated sales expenses for these final results***.") (emphasis added), <u>aff'd</u>, <u>ABB, Inc. v. United States</u>, 273 F. Supp. 3d 1200, 1206-10 (Ct. Int'l Trade 2017).

According to OARC's reporting, **[**


**]** OARC January 10 Submission at 6 (PR 98) (CR 75-76).  OARC claims that the freight it charges to its customers is not freight revenue because it "constitutes part of the overall price agreed on with the customer." <u>Id</u>.[3]  Under Commerce's capping methodology, however, the inclusion of freight in the terms of sale is irrelevant to the capping requirement and the necessary reporting for it.  The capping methodology is not dependent upon whether a respondent provides

---

[3]    It also claims that the **[**

**]** <u>Id</u>.  Presumably, OARC would not submit **[**

**]**

the services pursuant to the terms of sale.  What is relevant is whether the service was provided, there is evidence that service was negotiated between seller and buyer, and the revenues do not exceed the expenses to avoid a violation of the requirements of 19 U.S.C. § 1677a(c)(2).

In this case, **[**



**]**.  OARC has provided no contrary evidence.  Section A Response (PR 19-27) (CR 3-8) at Exh. A-8 (pdf pages 56-86).  Importantly, the **[**



**]** The record evidence demonstrates, therefore, that **[**



**]** Id. at Exh. A-8. (pdf page 68 and 79); OARC January 10 Submission at 6 (PR 98) (CR 75-76).  OARC has provided no record evidence to demonstrate that all other **[        ]** sales are not similarly situated.

OARC argues that there is no separate record evidence that the line items on the invoice to the customer "reflects negotiations with OARC's customer for purpose of Commerce's 'services was negotiated standard.'" OARC Br. at 26.  OARC provides no legal authority for this claim.  In fact, OARC misunderstands and misstates Commerce's test.  The standard established by Commerce and confirmed by the Court is that ***a respondent must separately report freight- and service-related revenues if <u>any</u> communication between itself and the customer indicates that such revenues are separately negotiated***.  There is no requirement that there be additional documents evincing a separate negotiation process, and OARC provides no precedent in support of its argument.

For example, in the 2016-17 review of <u>Large Power Transformers From Korea</u>, Commerce determined "that version two of the U.S. database accurately reflects reported service-related revenues that were separately negotiated based upon *any* sales documentation exchanged between {the respondent} and the unaffiliated customer which contains discussions of individual revenues and expenses." <u>Large Power Transformers From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017</u>, 84 Fed. Reg. 16,461 (Dep't Commerce Apr. 19, 2019), and accompanying IDM at 33 (Apr. 12, 2019) (emphasis added). Similarly, in the subsequent 2017-2018 review, the Department noted that it instructed the respondent to "'separately report all service-related revenues (*i.e.*, not grouped together or bundled) if those revenues are reflected on *any* sales documentation (*e.g.*, invoice, purchase order, contract, proposal, *etc.*)." <u>Large Power Transformers From the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018</u>, 84 Fed. Reg. 55,559 (Dep't Commerce Oct. 17, 2019), and accompanying Preliminary Decision Memorandum at 15 (Oct. 9, 2019) (emphasis added). The Court of International Trade has upheld this practice:

> {T}he court finds that substantial evidence supports Commerce's application of its capping methodology with respect to those transactions for which Commerce identified communications (e.g., purchase orders and invoices) between {the respondent} and its unaffiliated customers indicating that the provision of those services may reasonably have been separately negotiable.

<u>2018 ABB, Inc.</u>, 355 F. Supp. 3d 1206, 1221 (Ct. Int'l Trade 2018) ("<u>2018 ABB, Inc.</u>"), <u>vacated on other grounds</u>, <u>Hitachi Energy USA Inc. v. United States</u>, 34 F.4th 1375 (Fed. Cir. 2022). In <u>ABB, Inc.</u>, the Court expressly cited to the same standard instructions issued to the respondent as issued to OARC in this case:

> If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.

2018 ABB, Inc., 355 F. Supp. 3d at 1217-18.  The Court then explained:

> Commerce pointed to record evidence to support its finding that Hyundai failed to report properly service-related revenues, including multiple invoices to U.S. customers containing separate line items for services that Hyundai did not separately report.  … Those invoices were directly responsive to the agency's questionnaire and covered more than half of the sales for which Commerce received detailed documentation.  … These invoices constitute substantial evidence that Hyundai failed to provide Commerce with requested information.

Id. at 1218 (internal record citations removed).  The Court went on to explain that Commerce had similarly relied on purchase orders and invoices to establish the need for capping in a further review of the same order on LPTs:

> In the third administrative review of LPTs from Korea, also under review by this court, Commerce relied on purchase orders and invoices exchanged with the unaffiliated customer to conclude that the separate line items in those documents demonstrated that the services were negotiable.  Hyundai Heavy Indus., Co. Ltd. v. United States, Slip Op. 18-101, 2018 WL 4043236, at *5 (CIT Aug. 14, 2018).  As the court stated therein, "{w}hen Commerce finds that a service is separately negotiable, its practice has been to cap the service-related revenue by the associated expenses when determining the U.S. price."

Id.

Commerce's practice, therefore, as affirmed by the Court on multiple occasions and as set forth in the standard questionnaire instructions received by OARC, is to rely on line items on commercial invoices to establish whether separate service-related expenses have been agreed upon by the parties.  To find otherwise would also be expressly contrary to the instructions in the questionnaire, which specifically directed OARC to report freight revenues separately "if *the invoice* to your customer includes separate charges for other services directly related to the sales, such as a charge for shipping…."  CDQR at C-16 (Instructions for Fields 16 through 21) (PR 32-34) (CR 10-16, 37).

21

NONCONFIDENTIAL

Petitioners argued in their case brief that OARC's decision not to report any of the required individual freight calculations allowed OARC to avoid highlighting that it also had not separately reported [                                                                    ] Petitioners' Admin. Case Brief at 11 (PR 107) (CR 80). The only record documentation of movement expenses and [                    ] for U.S. sales is found in OARC's Section A Response at Exhibit A-8 – the U.S. sales trace, although OARC made no attempt to tie the documents in that exhibit to movement expenses until Petitioners exposed OARC's deficient reporting.  OARC AQR at Exh. A-8 (pdf pages 56-86) (PR 19-27) (CR 3-8).  OARC's late submission of a sample freight calculation on January 10 confirmed its failure to report [

] Without those corresponding freight expenses [                    ] OARC's reported U.S. gross unit prices are [

] As Commerce explained, OARC's failure to separately report this data prevented Commerce from determining the accuracy of it reporting.  Final IDM at 12.

While Commerce could have been more clear in explaining its decision, it has provided enough information that it is possible to discern the path of its reasoning, and the court may uphold its decision.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("We will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'") (citation omitted); NMB Sing. Ltd v. United States, 557 F.3d 1316, 1323 (Fed. Cir. 2009) ("While a more substantial explanation from Commerce might have been helpful to us or preferable to {respondent}, its absence here is not grounds for us not to affirm because we can nonetheless reasonably discern the path of Commerce's decision.") (citing State

NONCONFIDENTIAL

<u>Farm</u>, 463 U.S. at 43); <u>Shandong Huarong Gen. Group Corp. v. United States</u>, 122 F. Supp. 2d 143, 148 (Ct. Int'l Trade 2000) ("By statute, Commerce's administrative review determinations are presumed to be correct and the burden of proving otherwise rests exclusively upon the party challenging such decision.") (citing 28 U.S.C. § 2639(a)(1)).

## IV.    COMMERCE'S APPLICATION OF PARTIAL AFA IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

### A.    Commerce Did Not Abuse Its Discretion By Not Providing OARC With a Further Opportunity to Cure Its Freight Reporting Methodology

OARC and Daikin argue that Commerce abused its discretion buy by not providing OARC with an opportunity under 19 U.S.C. § 1677m(d) to correct the claimed defect in its reporting.  OARC Brf. at 28-30; Daikin Brf. at 8-12.  It also makes the related argument that Commerce could not apply partial AFA without first allowing OARC an opportunity to cure any defect under § 1677m(d).  OARC Brf. at 28-30 (ECF No. 37-38); Daikin Brf. at 9-12 (ECF No. 36).  OARC's reliance on § 1677m(d) is misplaced under the facts of this case.  Section 1677m(d) requires:

> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. § 1677m(d).  Based on the language of the statute, the duty to inform a respondent of its deficiencies and provide an opportunity to cure is not absolute.  The statutory opportunity to cure is caveated by the phase "to the extent practicable" and also may be limited by time

NONCONFIDENTIAL

constraints. As in this case, the requirement may also be limited by the lack of cooperation of the respondent.

As Commerce explained in its Final IDM, the agency did not seek further information from OARC before the Preliminary Results due to OARC's misstatement that it "'had no freight allocation calculation to explain' to Commerce because it used 'actual per-unit' movement expenses from its accounting system.'" Final IDM at 5 (PR 117); see also id. at 11. Commerce explained, "we failed to notify {OARC} of any deficiencies in the movement expense reporting … because it claimed its expenses were not allocated." Id. at 11 (PR 117). As the Court has recognized, a respondent that affirmatively misleads Commerce into not inquiring about a deficiency cannot claim the benefit of § 1677m(d):

> Inherent in the requirement of § 1677m(d) is a finding that Commerce was or should have been aware of the deficiency in the questionnaire response. When a respondent provides seemingly complete, albeit completely inaccurate, information, § 1677m(d) does not require Commerce to issue a supplemental questionnaire seeking assurances that the initial response was complete and accurate. In other words, Commerce is not obligated to issue a supplemental questionnaire to the effect of, "Are you sure?" That is the case here.

2018 ABB, Inc., 355 F. Supp. 3d at 1222; see also Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States, Ct. No. 23-00264, Slip Op. 26-63 at 20, 2026 Ct. Intl. Trade LEXIS 80 (June 16, 2026) ("By contrast, section 1677m(d) does not apply where Commerce determines that a party's submitted information, although facially responsive, is insufficient to support the ultimate determination the party seeks."). As with the respondent in 2018 ABB, Inc., where OARC had claimed to provide a seemingly complete questionnaire response right up to the date of the Preliminary Results, Commerce was not in a position to know what was missing in OARC's response.

24

NONCONFIDENTIAL

> In the absence of all of Hyundai's documentation, Commerce was not in a position to know that Hyundai's responses were incomplete and inaccurate. Commerce prepares its questionnaires to elicit information that it deems necessary to conduct a review, and the respondent bears the burden to respond with all of the requested information and create an adequate record. See Nan Ya Plastics Corp. Ltd. v. United States, 810 F.3d 1333, 1337 (Fed. Cir. 2016); QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011).

Id. OARC's statements while the record was open misled Commerce,[4] and it did not become obvious to Commerce that the record was incomplete until the January 10 Submission in which OARC demonstrated what had been missing from the record. Under these circumstances, as was the case in ABB, Inc., "Commerce was not statutorily mandated to provide {the respondent} a subsequent opportunity to remedy the deficiency." 2018 ABB, Inc., 355 F. Supp. 3d at 1223 (material in braces added); see also Assan Aluminium Sanayi ve Ticaret A.S. v. United States, 624 F. Supp. 3d 1321, 1367-68 (Ct. Int'l Trade 2024).

Moreover, in this case, OARC submitted information with its January 10 Submission that demonstrated (1) movement expenses had been calculated or allocated, and (2) freight revenues included in gross unit price had been assigned by the parties to cover those movement services and had not been separately reported as required by the questionnaire. Final IDM at 5, 11. Commerce ultimately accepted that information for the record to illustrate the deficiency, but it did not find that it cured the deficiencies. Section 1677m(d) permits Commerce to ignore all or part of the record evidence submitted by the respondent if Commerce finds that the response is

---

[4]    This factually distinguishes this case from Bowe-Passat v. United States cited by OARC. See OARC Opening Brf. at 23 citing Bowe-Passat v. United States, 17 Ct. Int'l Trade 335 (1993). In that case, the court found that Bowe was misled by the Commerce Department into believing the issue not to be important. In this case, it was OARC that affirmatively misled the Department by making statements that led the Department to believe that no issue existed. See Final IDM at 11 (Commerce "failed to notify {OARC} of any deficiencies in the movement expense reporting … because it claimed its expenses were not allocated.").

NONCONFIDENTIAL

not satisfactory or was not submitted in the applicable time limits. At a minimum, the January 10 Submission was not satisfactory because it showed that freight revenues had not been separately reported as required by the questionnaire. In addition, the January 10 Submission was submitted after the record was closed.

That OARC intended the January 10, 2025 Submission to rebut Petitioner's claims rather than as the admission against interest does not render Commerce's findings "a reversable 'unreasonable judgment in weighing factors.'" OARC Brf. at 24 (quoting Star Fruits S.N.C. v. United States, 393 F.3d 1277 (Fed. Cir. 2005), citing Arnold P'ship v. Dudas, 362 F.3d 1338, 1340 (Fed. Cir. 2004)) ("An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors"). The language OARC quotes from Star Fruit merely states the standard for an abuse of discretion under the APA. Other than disagreeing with Commerce's conclusion, however, OARC has not identified the relevant factors that Commerce allegedly unreasonably weighed to abuse its discretion. Moreover, the Court has found that an agency does "not abuse its discretion in refusing to recalculate the margin when the error made by {Commerce} is attributable to plaintiffs' late submission of ambiguous information." Asociacion Colombiana de Exportadores de Flores v. United States, 704 F. Supp. 1114, 1124 (Ct. Int'l Trade 1989), aff'd, 901 F.2d 1089 (Fed. Cir. 1990). Importantly, Commerce's findings that OARC had not explained its movement expense reporting (see section II supra) and failed to report freight revenues (section IV, infra) are supported by substantial evidence.

**NONCONFIDENTIAL**

**B.        Gaps in the Record Justified the Application of Facts Available**

OARC argues that there were no gaps in the record to justify the use facts available. OARC Br. at 30. Contrary to this claim, Commerce found that the January 10 Submission revealed a that OARC (1) had engaged in previously unreported allocations and calculations to derive its reported movement expenses for five variables; and (2) confirmed that it had failed to report invoice line items showing the allocation of freight revenue that was not separately reported in the response as required by the questionnaire. Final IDM at 5-6. As discussed in Section I above, OARC's reliance on an alleged distinction between calculations and allocations is a fiction that has no rational basis in the questionnaire instructions or Commerce's practice. See Section II, supra. OARC had a duty to report and document its allocations and calculations of all expenses, and its affirmative failure to do so prevented Commerce from examining the accuracy of OARC's expense reporting. Final IDM at 5-7, 10-11.

In addition, as discussed in Section II above and reaffirmed by OARC's position on appeal, OARC failed to report freight revenues that were reported on invoices to its customers, as evidenced on the invoice in Exhibit A-8. It was not until OARC more fully explained its reporting methodology after the Preliminary Results that Commerce understood OARC's failure to report these freight revenue line items. Final IDM at 6-12. Without separate breakouts of these revenues and associated expenses, Commerce could not calculate an accurate margin. OARC relies solely on its obtuse insistence that invoice line items showing the portion of the gross unit price do not represent freight revenues without further evidence of some negotiation. As discussed in section II above, that is not the court-approved standard applied by Commerce.

27

NONCONFIDENTIAL

## V.   COMMERCE'S APPLICATION OF AN ADVERSE INFERENCE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

The statute permits Commerce to rely on an adverse inference where "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority…." 19 U.S.C. § 1677e(b)(1). Whether an interested party has acted to the best of its ability is determined based on whether the respondent put forth its maximum effort. Nippon Steel Corp. v. United States, 337 F.3d. 1373, 1381 (Fed. Cir. 2003). As OARC correctly states, a "key question is whether 'it is reasonable for Commerce to expect that more forthcoming responses should have been made.'" OARC Brf. at 33-34 (citing Huang Vuong Corp. v. United States, 483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020), quoting Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1383 (Fed. Cir. 2002)). This standard requires Commerce to "examine {a} respondent's actions and assess the extent of {a} respondent's abilities, efforts, and cooperation" throughout the proceeding. Nippon Steel Corp., 337 F.3d at 1382. Commerce appropriately applied this standard when it found that application of adverse facts was necessary because OARC did not exert its maximum effort to provide Commerce with full and complete responses to its requests for information, thereby failing to act to the best of its ability. Final IDM at 7. Commerce found:

> The information missing from the record reflects a failure to clearly identify the nature of the per-unit movement expense reporting to allow for greater scrutiny of the allocation, failure to provide the calculations of per-unit allocations required by the Initial Questionnaire to evaluate proper methodology and accurate calculation, and failure to identify freight revenues to assess whether expenses are appropriately capped to service-related revenues. While the Federal Circuit noted that the "best of its ability" standard does not require perfection, "it does not condone inattentiveness, carelessness, or inadequate record keeping." We find that failure to identify and support the methodology used to calculate movement expenses and revenues to allow for greater

28

> scrutiny, at the very least, amounts to inattentiveness, carelessness, and inadequate record keeping which significantly impeded the proceeding and renders certain movement expense reporting unverifiable.

Final IDM at 7 (footnote omitted). Commerce described that OARC how "OARC impeded the proceeding" in claiming that freight expenses were reported directly from SAP on a per unit basis (rather than being allocated), "which rendered the false impression that no further scrutiny was necessary in this regard." Id., citing OARC's Rebuttal Pre-Prelim Comments at 22 (PR 84) (CR 67) and OARC's CQR at 25 (PR 32-34) (CR 10-16, 37); see also Final IDM at 11 (PR 117). Commerce then explains that "the revelation that certain movement expenses were, in fact, allocated (and freight revenues included in price, but not separately reported for an unspecified number of transactions) in the January 10 Submission effectively renders OARC nonresponsive with respect to its reporting of per unit freight." Id. at 7. While Commerce generously described these events as "at the very least, amount{ing} to inattentiveness, carelessness, and inadequate record keeping," they also could describe a deliberate attempt to mislead Commerce. Id. Indeed, Commerce's decision describes "OARC's refusal to provide an explanation of its allocated expenses in its initial questionnaire response," which "significantly impeded the proceeding, and importantly, prevented Commerce from seeking further information to verify the accuracy of OARC's reported movement expenses." Id. at 11. There is no record evidence that it would have been burdensome or impossible for OARC to submit the detailed information requested by Commerce, and OARC made no such claim to the agency. Commerce's application of AFA was reasonable and supported by substantial evidence.

OARC's entire defense to these findings is its unilateral invention of a distinction between allocations (which it agrees it would have been required to document) and calculations (which it insists it was not required to further document). OARC Brf. at 34-35. As fully

NONCONFIDENTIAL

explained in Section II, this is a difference without a distinction, and OARC's claims are not supported by record evidence. Based on a plain reading of the questionnaire, OARC owed Commerce a complete and accurate accounting of its allocations and calculations of movement expenses and revenues, separate reporting of each in their own variables, and supporting worksheets tied to business records. Instead, Commerce received from OARC general denials that any allocations or calculations existed, obviating the need for the remaining items. The January 10 Submission confirmed that OARC's previous representations were incorrect, and the record was incomplete. Under these circumstances, OARC was properly found not to have cooperated to the best of its ability, providing the legal and factual justification for the application of adverse inferences. Even if one could credit OARC's argument that it reasonably misunderstood Commerce's instructions, the record still contains substantial evidence that OARC's reading was unreasonable. Commerce's findings "may still be supported by substantial evidence even if two in consistent conclusions can be drawn from the evidence." Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 217 (1938)).

OARC also argues that it should not have been subject to an adverse inference because it deserved credit for its cooperation in other respects. OARC Brf. at 35. In choosing to apply partial rather than total adverse facts, however, Commerce did give OARC credit for the cooperation it did evince in other areas:

> In selecting among possible sources of information in applying adverse inferences, because OARC's reporting of sales and cost information otherwise reflected fulsome and cooperative reporting and the scope of the information withheld is limited to only the accuracy of the calculation of per-unit movement expenses and the ability to properly cap service-related revenues to the amount of such expenses, we determine that it is appropriate to apply a partial

NONCONFIDENTIAL

> adverse facts available inference with respect to the affected expenses (and revenues).

Final IDM at 7 (PR 117). OARC is not entitled to have missing or inaccurate data credited in a manner in which it benefits from its own lack of cooperation. See Final IDM at 4 (PR 117) (citing Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Rep. No. 103–316, at 870 (1994)). Ignoring the record gaps in this case would do just that, and Commerce properly refused to do so.

OARC also argues that Commerce should not have applied AFA to OARC's U.S. duty payments because the agency allegedly had not identified any specific deficiency with regard to reporting of U.S. duties. OARC Brf. at 36-37. Commerce, however, explained that it applied facts available to each of the five movement-related expenses that were allocated or calculated from broader data by OARC, including U.S. duties:

> Thus, for each of the five aforementioned freight variables (DINFLTPU, INTNFR1U, INTNFR2U, INFLWCU, and USDUTYU), OARC failed to plainly identify that such expenses reflected allocations, not transaction-specific unit costs (aside from a reference to inland freight data being unavailable in the sample documentation provided for one sample sale), and failed to provide the requested worksheets demonstrating its calculation of the allocation where such expense were in fact allocated over a POR-average or multiple transactions, as instructed in the Initial Questionnaire.

Final IDM at 5 (PR 117). Thus, U.S. duties had the same reporting problems as other movement expenses.

Contrary to OARC's claims, Commerce's calculation of adverse facts available was not penal in nature. Commerce identified two separate problems with OARC's reporting and applied two separate remedies to individually address those problems. See OARC Br. at 37-40. First, because OARC failed to report separately freight revenues, Commerce reduced all of the

NONCONFIDENTIAL

reported gross unit prices by the amount of freight revenue in gross unit price for the one reported sale for which it had freight revenue information.     Final IDM at 7 ("Specifically in calculating a margin for OARC, as partial AFA, we did not credit OARC's inclusion of unverifiable service-related revenues in the gross unit price."). The adverse assumption was that all reported gross unit prices contained such allocations of freight revenues. Id. at 8. OARC has never disputed that such itemized line items commonly existed on its other invoices; it has only claimed that such itemized freight items should not be deemed to be freight revenues. Given that freight revenues for the single entry were the only information available on freight revenues, its use cannot be deemed penal or even particularly adverse.

Second, due to OARC's deficient reporting and support for its calculated freight expenses, Commerce found that OARC had not met its burden to establish its entitlement for the claimed adjustments to U.S. price. Id. at 8 citing ABB, Inc. vs. United States, 273 F. Supp. 3d at 1209 ("Commerce has reasonably placed the burden to establish entitlement to adjustments on {respondent}, the party seeking the adjustment and the party seeking the adjustment and the party with access to the necessary information.") (additional citations omitted). As AFA, Commerce "disregarded the unverifiable per-unit expense variables reported, identified the highest reported transaction-specific expense for any reported transaction as reported in OARC's U.S. sales database at Exhibit C-2 of OARC's CQR, and applied that amount as the relevant movement expense incurred for all reported transactions...." Final IDM at 8. These two adjustments appropriately reduced the reported gross unit price for the presumed amount of freight revenues and deducted freight expenses as required by statute. The freight expenses deducted were the highest reported for any sale, due to "OARC's failure to provide record information to confirm the accuracy of the allocations of per-unit expense when deducting the

**NONCONFIDENTIAL**

relevant expenses from U.S. price." Id. Both applications of AFA are appropriate and consistent with Congressional intent that a respondent does not benefit from its own lack of cooperation. See SAA at 870.

OARC complains that Commerce failed to apply its revenue capping methodology to OARC by offsetting freight expenses by freight revenue. OARC Brf. at 39. OARC, however, did not accurately or completely report the data necessary to apply Commerce's capping policy. Providing such an offset in the context of an AFA result would benefit OARC for its own lack of cooperation, and Commerce appropriately declined to do so under the circumstances. If OARC wanted the benefit of capping, it was obligated to accurately report freight revenues and expenses as required by the questionnaire.

## CONCLUSION

For the reasons presented herein, Defendant-Intervenors respectfully urge this Court to sustain the Final Results in their entirety.

Respectfully submitted,

/s/  R. Alan Luberda
JOHN M. HERRMANN
R. ALAN LUBERDA
MATTHEW G. PERERIA
KELLEY DRYE & WARREN LLP
670 Maine Avenue, SW, Suite 600
Washington, DC 20024
(202) 342-8400

Counsel to Defendant-Intervenors

Dated: July 13, 2026

33

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's Order dated January 21, 2026 (ECF No. 34), setting the word limitation of Defendant-Intervenors' Response Brief to 14,000 words, counsel for Defendant-Intervenors Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas and JW Aluminum certifies that this Response Brief contains 10,276 words, including footnotes, tables and charts. The word count certification is made in reliance on the word count feature contained in Microsoft 365 – Enterprise.

Respectfully submitted,

/s/ R. Alan Luberda

R. ALAN LUBERDA
JOHN M. HERRMANN
MATTHEW G. PEREIRA
KELLEY DRYE & WARREN LLP
670 Maine Avenue, SW, Suite 600
Washington, DC 20024
(202) 342-8400

Counsel to Defendant-Intervenors Aluminum
Association Trade Enforcement Working Group
and its individual members

Dated:  July 13, 2026